## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Rodney J. Ireland, Lester McGillis, Gerald
DeCoteau, William Carter, Ryan Corman,
Matthew Graham, Terry Greak, Glenn
Halton, Robert Hoff, Monte Hojian,
Jeremy Johnson, Michael Kruk, Garrett
Loy, Kevette Moore, Cruz Muscha, Darin
Napier, Paul Oie, Timothy Olpin, Larry
Rubey, Christopher Simon, Kelly Tanner,
John Westlie, Robert Lilley, Darl Hehn,
Oliver Wardlow, Joshua Keeping, Matthew
Dyer, Travis Wedmore, Kyle Aune,
Marcus Bartole, Jason Gores, Estel Naser,
Andrew Olafson, Stanton Quilt, Raymond
Voisine, Eugene Wegley, David Anderson,
Eugene Fluge, Robert Beauchamp, Sandy
Mangelsen, and Eugene Hinson,

      Plaintiffs,

    vs.

Maggie D. Anderson, Executive Director,
North Dakota Department of Human
Services, in her official capacity, Leann
Bertsch, Director, North Dakota
Department of Corrections and
Rehabilitation, in her official capacity,
State of North Dakota, North Dakota
Department of Human Services, North
Dakota Department of Corrections and
Rehabilitation, North Dakota State
Hospital, and Dr. Rosalie Etherington,
Superintendent of the North Dakota State
Hospital, in her official capacity,

      Defendants.

Case No. 3:13-cv-3

**REPORT AND RECOMMENDATION**

Forty-one named plaintiffs challenge various aspects of North Dakota's system for civil commitment of persons who have been found to be sexually dangerous individuals (SDIs). The plaintiffs now move for certification of four separate classes and of three subclasses within one of those classes. (Doc. #343).

**Summary**

District courts are vested with discretion to apply the criteria of the applicable rule when determining whether class certification is appropriate. Considering each of those criteria, each of the proposed classes can be found to meet each of the rule's criteria.

However, the proposed class representatives for one of the requested classes—the Department of Corrections and Rehabilitation (DOCR) Class—lack standing to pursue claims of that class. This court therefore recommends that the motion for class certification be denied as to that proposed class and granted as to the other proposed classes and subclasses.

**Background**

North Dakota, like at least twenty other states, has adopted a statutory process for civil commitment of SDIs. See N.D. Cent. Code ch. 25-03.3. Under that statutory framework, a state's attorney can initiate a civil commitment proceeding by filing a petition with a district court. Id. § 25-03.3-03(1). If a petition is filed, the person alleged to be an SDI has a statutory right to notice, a right to counsel, a right to a hearing, and a right to services of an expert witness at state expense. Id. §§ 25-03.3-09 to -13.

The SDI civil commitment process usually begins while a person is serving a prison term in custody of the DOCR. If a person who has been convicted of "an offense that includes sexually predatory conduct" is in DOCR's custody, DOCR is required to assess the person and to decide whether to recommend civil commitment as an SDI. Id. § 25-03.3-03.1(1). DOCR's assessment is to occur approximately six months prior to the person's projected date of release from custody. If DOCR determines that a person may

meet the statutory definition of an SDI, DOCR is required to refer that person to one or more state's attorneys for possible civil commitment proceedings. Id. § 25-03.3-03(2). If a state's attorney files a petition after getting DOCR's recommendation, the person is transferred from DOCR custody to custody of the county where the petition was filed, pending a preliminary hearing. Id. § 25-03.3-03.11.

At a preliminary hearing, the state court determines whether there is probable cause to believe the individual is an SDI. If the court does not find probable cause, the petition is dismissed. Id. If the state court finds probable cause, the person is transferred to the North Dakota State Hospital (NDSH) for evaluation. Following evaluation, the state district court conducts a commitment hearing. The governing statute provides that a commitment hearing is to be held within 60 days of a finding of probable cause, unless the court finds good cause to extend that time. Id. § 25-03.3-13. But, declarations in the record describe plaintiffs being in the evaluation process at NDSH for as long as 197 days, 234 days, and 1 year. (Doc. #345-2, p. 2; Doc. #345-4, p. 2; Doc. #345-5, p. 2).

At a commitment hearing, the state has the burden to prove, by clear and convincing evidence, that the person meets the statutory definition of an SDI. To meet that burden, the state must prove (1) that the person has engaged in sexually predatory conduct, (2) that the person has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or another mental disorder or dysfunction, and (3) that the disorder makes that person likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. N.D. Cent. Code § 25-03.3-01(8).

Under North Dakota's system, individuals who are found to be SDIs are committed to the custody of the Department of Human Services (DHS) for placement in

"an appropriate facility or program at which treatment is available." Id. § 25-03.3-13. The placement is to be in the "least restrictive available treatment facility or program necessary to achieve the purposes of [the SDI statutes]," though DHS is not required to "create a less restrictive treatment facility or treatment program specifically for [a] respondent or committed individual." Id.

Upon their commitment, DHS places SDIs in a facility on the NDSH campus—the Gronewald/Middleton Building. (Doc. #246, p. 27). DHS may initiate a petition seeking a court's approval for a community placement—rather than placement at NDSH—but an SDI may not petition for community placement, and the state courts have determined that a court cannot order community placement in the absence of a DHS request. N.D. Cent. Code § 25-03.3-24(1); In re Whitetail, 868 N.W.2d 833, 840 (N.D. 2015). SDI treatment stages are described in a resident handbook, and it appears that handbook contemplates a minimum of two to three years to complete the treatment program. (Doc. #344-3, pp. 15-23).

The governing statutes require that an individual who is committed as an SDI have an annual examination, with an exam report to be provided to the court that ordered the commitment. If an SDI is indigent, the statutes also give the SDI a right to an annual examination by a court-appointed expert at state expense. N.D. Cent. Code § 25-03.3-17(2). After receiving an annual report, the court may order further examination and may hold a hearing to determine whether the commitment should continue. Id. § 25-03.3-17(4).

Once committed, an SDI remains committed indefinitely, unless a court orders discharge. Discharge petitions can be initiated by an SDI or by DHS. Id. § 25-03.3-17(5).

There is a statutory requirement that an SDI receive annual notice of the right to petition for discharge, id. § 25-03.3-18(1), and an SDI is entitled to a discharge hearing every twelve months, id. § 25-03.3-18(2). At a hearing on a discharge petition, the SDI again has a right to a court-appointed expert at state expense. Id. § 25-03.3-18(3). In a discharge hearing, as in an initial commitment hearing, the state must prove, by clear and convincing evidence, that the person meets the statutory definition of an SDI. Id. § 25-03.3-18(4). Both initial orders for commitment as an SDI and orders denying petitions for discharge are appealable to the state supreme court. Id. § 25-03.3-19.

North Dakota began implementation of chapter 25-03.3 in 1997 through its Sex Offender Treatment and Evaluation Program (SOTEP). According to the defendants,[1] approximately 170 individuals have been evaluated by SOTEP to date, and approximately 100 of those individuals have been committed as SDIs. (Doc. #361, pp. 6-7). Of those who have been committed, approximately 46 were subsequently discharged from NDSH. Id. According to the plaintiffs, 23 SDIs were discharged pursuant to court orders over DHS' objection, 5 SDIs were discharged after annual reviews or on their own petitions but without DHS' objection, and 2 SDIs were discharged based on DHS-initiated petitions. (Doc. #344, pp. 2-3). Five SDIs have been approved for community placement—three based on DHS-initiated petitions, and two after annual review without DHS' objection. Id.[2]

---

[1] The statistical information which the plaintiffs provided is not completely consistent with that provided by the defendants. The discrepancies appears to result, at least in part, from continuing commitments and discharges. Unless otherwise noted, the discrepancies are not considered material to the instant motion.

[2] The plaintiffs state that they do not yet have information showing the path to release of all of those who have been released.

The plaintiffs' compilation of discovery data, which defendants have not questioned, shows that, of those currently confined at NDSH as SDIs, over half have been there for 8 or more years, and at least 25% have been there more than 10 years. Id. at 1. The first person who was evaluated as an SDI, plaintiff Matthew Dyer, was committed in 1998, and remained at NDSH until he was moved to a community placement in July 2016, eighteen years later. Id.; (Doc. #382-2, p. 2).

## Plaintiffs' Claims

The plaintiffs claim that, since 2004, the defendants have implemented the SDI system under a policy of preventive detention, resulting in unconstitutional confinement of persons who are neither dangerous nor in need of further treatment. Plaintiffs have submitted data which shows a significant increase in the number of persons committed as SDIs beginning in 2004. (Doc. #343-1, p. 10). According to the plaintiffs, North Dakota transformed its SDI system as a consequence of a 2003 kidnapping and murder of a young Grand Forks woman, which was committed by a convicted sex offender who had been released from a Minnesota prison. The case garnered very extensive publicity, and resulted in the sex offender being sentenced to death in a federal case. See United States v. Rodriguez, D.N.D. Case No. 2:04-cr-55.

The plaintiffs further allege that, after 2004, NDSH added "prison-like features" to the Gronewald/Middleton Building and implemented "prison-type policies" for the SOTEP program. (Doc. #344-45, p. 3) (2007 Report of the Legislative Council describing "numerous risk-reduction strategies" implemented after escape of an SDI).

As claims common to the proposed classes, the plaintiffs allege that the defendants have:

(1)     adopted and enforced an unconstitutional policy of preventive detention;

(2)     created a civil commitment system that is punitive;

(3)     not provided a less restrictive confinement option;

(4)     not completed annual assessments of SDIs;

(5)     used unconstitutional criteria for continued confinement;

(6)     not implemented statutory provisions for community placement;

(7)     not initiated discharge petitions or engaged in discharge planning;

(8)     not provided adequate treatment to SDIs;

(9)     continued confinement because SDIs decline to make self-incriminating statements;

(10)    created "unnecessarily punitive" conditions of confinement;

(11)    not provided adequate medical care to SDIs;

(12)    committed persons as SDIs who have no underlying sexual disorder;

(13)    committed persons as SDIs based on "sexually predatory conduct" committed while the person was a juvenile;

(14)    not treated SDIs with disabilities in the least restrictive environment;

(15)    burdened SDIs' exercise of religion;

(16)    treated SDIs differently than "persons requiring treatment" under North Dakota Century Code chapter 25-03.1;

(17)    violated SDIs' Fourth Amendment rights by conducting unreasonable searches and seizures;

(18)    interfered with SDIs' First Amendment right to petition the government,

(19)    violated SDIs' procedural and substantive due process rights by using a referral process that "lacks a rational basis";

(20)    subjected SDIs to punitive conditions in violation of their due process and equal protection rights; and

(21)     sought reimbursement from SDIs for the costs of their involuntary
         commitment.

(Doc. #343-1, pp. 17-34).

### Proposed Classes and Subclasses

The plaintiffs seek certification of four separate classes, and of three subclasses

within one of those four classes.

First, the plaintiffs propose a SOTEP Class, consisting of "all persons civilly

committed to the [DHS] pursuant to N.D.C.C. Chapter 25-03.3 and confined in the Sex

Offender Treatment and Evaluation Program at NDSH," with subclasses consisting of:

(1)     all SOTEP Class members with disabilities as defined under the Americans
        with Disabilities Act (ADA Subclass);

(2)     all SOTEP Class members whose civil commitment was based on "sexually
        predatory conduct" (as defined by North Dakota Century Code section 25-
        03.3-01(9)) committed while they were minors (Juvenile Subclass); and

(3)     all SOTEP Class members whose religious exercise has been substantially
        burdened while civilly committed (Religious Land Use and
        Institutionalized Persons Act, or "RLUIPA" Class).

(Doc. #343, pp. 1-2).

The plaintiffs assert that the proposed SOTEP class has over 50 members. (Doc.

#343-1, p. 14). According to the defendants, the proposed SOTEP class would include, at

most, 55 members, 28 of whom are named plaintiffs. (Doc. #361, p. 13). As to the three

subclasses, the plaintiffs assert that eleven persons—four of whom are named

plaintiffs—would qualify for the proposed ADA Subclass, that at least six would qualify

for the proposed Juvenile Subclass, and that at least ten would qualify for the proposed

RLUIPA Subclass. (Doc. #343-1, pp. 15-16). The defendants assert that evidence shows

only one member of the proposed ADA Subclass. (Doc. #361, pp.13-14). As to the

proposed Juvenile Subclass, the defendants contend that evidence shows no members, Id. The defendants do not dispute that the proposed RLUIPA Subclass could include at least ten members, but note that five of those persons are named plaintiffs. Id. at 14.

Second, the plaintiffs propose a DOCR Class, consisting of all sex offenders, as defined in Department of Corrections and Rehabilitation Policy No. 1A-16 (2012), (see Doc. #344-20), committed to the custody of DOCR "who have been or will be referred to a state's attorney for civil commitment" as provided by North Dakota Century Code section 25-03.3-03.1. (Doc. #343, p. 2). The plaintiffs state that their review of the North Dakota Attorney General's Sex Offender Website has identified over 75 persons currently in custody at the North Dakota State Penitentiary (NDSP) who would meet the criteria for the proposed DOCR Class. (Doc. #343-1, pp. 14-15). The defendants counter that no person in the proposed DOCR Class has yet suffered an "injury in fact," and that therefore no person in that proposed class has standing. (Doc. #361, pp. 14-15).

Third, the plaintiffs propose an Evaluation Class, consisting of "all persons in custody at [NDSH] for evaluation as to whether they are [SDIs] pursuant to N.D.C.C. § 25-03.3-11." (Doc. #343, p. 2). The plaintiffs recognize that only a small number—five—would qualify for the proposed Evaluation Class at this time, but argue that class certification is nonetheless appropriate because of the "fluid nature of the population" and the short time any individual is on evaluation status. (Doc. #343-1, p. 15). The defendants have not questioned the plaintiffs' assertion that five persons would qualify for an Evaluation Class at this time.

Finally, the plaintiffs propose a Debt Class, consisting of "all persons from whom DHS or NDSH has demanded payment since January 1, 2004, for their civil

commitment as [SDIs] pursuant to Chapter 25-03.3." (Doc. #343, pp. 2-3). According to

the plaintiffs, more than 90 persons—all those who are or have ever been committed as

SDIs—would qualify for the proposed Debt Class. (Doc. #343-1, p. 14). The defendants

contend that, since they demand payment only from those who have been discharged

from SOTEP, and since only 46 persons have been discharged to date, the proposed

Debt Class could not exceed 46 members. (Doc. #361, p. 14). Additionally, the

defendants contend that the plaintiffs have not identified any plaintiff from whom DHS

or NDSH has actually demanded payment, and therefore have not identified anyone

who would have standing as a member of the proposed Debt Class. Id.

## Law and Discussion

Class certification is governed by Federal Rule of Civil Procedure 23, which

provides:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the
> claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. Pro. 23(a). In addition to the four elements of Rule 23(a), class certification

requires that one of three criteria of Rule 23(b) be satisfied. In this case, the plaintiffs

assert they meet the criteria of Rule 23(b)(2)—"the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole."

The plaintiffs have the burden to establish each of Rule 23's requirements. Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). In considering a motion for class certification, the court must conduct a "rigorous analysis" to ensure that all Rule 23 requirements are satisfied. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 155 (1982). Though the merits of the claims and defenses are not directly addressed in the context of class certification, the required rigorous analysis is to involve "consideration of what the parties must prove." Elizabeth M. v. Montenez, 458 F.3d 779, 786 (8th Cir. 2006). Of course, the court must "ensure that it has Article III jurisdiction to entertain each claim asserted by the named plaintiffs." Id. But, when there are questions as to whether class certification is appropriate, the court is to give the benefit of the doubt to certifying the class. Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013).

In civil rights matters, Rule 23(b)(2) is to be "read liberally." Coley v. Clinton, 635 F.2d 1364, 1378 (8th Cir. 1980). Where a class action is to be certified for injunctive relief under Rule 23(b)(2), courts have taken a more flexible approach in defining the class, since notice to class members is not required under Rule 23(b)(2), and since no questions as to distribution of any monetary relief are involved. When considering motions for class certification in actions seeking injunctive relief against state agencies, however, a court must be "constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." Elizabeth M., 458 F.3d at 784.

Most of the courts of appeals recognize additional, implicit, requirements of Rule 23—that the class be ascertainable with reference to objective criteria and that there be a reliable mechanism to determine whether putative members come within the objectively

defined class. The Eighth Circuit, however, has not adopted ascertainability as a separate element. In a recent opinion, the Eighth Circuit stated that, rather than addressing ascertainability as a separate preliminary requirement, "this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc., 821 F.3d 992, 995-96 (8th Cir. 2016).[3] This opinion therefore does not separately address the implicit requirements as defined by other circuits. The parties' arguments concerning those implicit requirements are instead incorporated into the discussion of standing and of the explicit requirements of Rule 23.

1.    **Standing**

The defendants argue that standing is lacking as to some of the plaintiffs' claims. In class actions, as in any other federal case, plaintiffs must establish standing to sue. The purpose of the standing requirement is to ensure that a plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204 (1962). Federal courts use a familiar three-part test to determine whether a plaintiff has standing to sue. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered "injury in fact." Second, the injury must be traceable to the defendant's action which is being

_____

[3] Prior to the recent Sandusky decision, some district courts in this circuit had also considered the implicit requirements adopted in other circuits as separate elements. Liles v. Am. Corrective Counseling Servs., Inc., 231 F.R.D. 565, 571 (S.D. Iowa 2005);  Dirks v. Clayton Brokerage Co. of St. Louis, Inc., 105 F.R.D. 125, 130 (D. Minn. 1985).

challenged. Id. Finally, the injury must be one that would be redressed by a decision favorable to the plaintiff. Id. at 561. The first element—injury in fact—requires a showing that an injury is concrete and particularized and "actual or imminent," not conjectural or hypothetical. Id. at 560.

As described by the Supreme Court:

[T]he fact that a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."

Gratz v. Bollinger, 539 U.S. 244, 289 (2003) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976)). A class cannot be certified if it includes members who lack standing; rather, a class must be "defined in such a way that anyone within it would have standing." Halvorson v. Auto-Owners Ins. Co., 718 F.3d 773, 779 (8th Cir. 2013).

The relationship between the doctrine of standing and Rule 23's class certification requirements, however, makes standing analysis more complex in class actions:

The doctrine of standing insists on a relationship between a plaintiff's individual harm and the scope of the claims that she seeks to litigate. This relationship is complicated in a class action because a named plaintiff seeks to litigate the claims of others, as well as her own claims, and because the requirements of Rule 23(a)—commonality, typicality, and adequacy—exist to test the relationship between the named plaintiff's claims and those of the class. The concepts of standing and Rule 23(a) therefore appear related as they both aim to measure whether the proper party is before the court to tender the issues for litigation. But, they are in fact independent criteria. They spring from different sources and serve different functions. Because individual standing requirements constitute a threshold inquiry, the proper procedure when the class plaintiff lacks individual standing is to dismiss the complaint, not to deny class certification. The class issues are not reached in

this instance. On the other hand, when a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class.

1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 2:6, pp. 76-77 (5th ed. 2011).

In the context of class actions, the standing analysis may be complicated by a "disjuncture" between the harm that a plaintiff suffered and the requested class relief. Courts have approached this disjuncture problem in differing ways:

Put simply, the scope of the harm defines the contours of a plaintiff's standing and hence of her claims.

While the principle is simple to state in individual cases, its application to class action practice is more complex. The confusion is generated because the disjuncture . . . is refracted through the representative relationship: the class representative may seek to litigate harms not precisely analogous to the ones she suffered but harms that were nonetheless suffered by other class members. This situation generates confusion because it can be, and has been, addressed in two distinct manners: some courts, applying the standing principle identified [in the paragraph quoted] above, simply find that the class representative lacks standing to pursue the class members' claims because she did not suffer their injuries in this disjuncture situation. Other courts, having determined that the class representative has standing to pursue her own claims, move on from the standing inquiry and approach the disjuncture as an issue of class certification, not standing; these courts may hold that the class representative cannot pursue the harms that she did not suffer because her claims are not typical of those class members' claims and/or because she cannot, therefore, adequately represent those claimants. In short, there is a "standing" and a "class certification" approach to the disjuncture problem.

<u>Id.</u> at 78. The <u>Gratz</u> court noted a "tension" in prior cases as to whether similarity of injuries suffered by a named plaintiff and unnamed class members is "appropriately addressed under the rubric of standing or adequacy." 539 U.S. at 263 n.15. In <u>Gratz</u> itself, the Court found the requisite standing despite some disjuncture between the harm suffered and the relief sought. <u>Newberg on Class Actions</u> suggests that <u>Gratz</u> holds that a

disjuncture problem can be overcome by demonstrating a sufficient relationship between the named plaintiff's injury and the class' injury, such that the named plaintiff can litigate the claims of the class. Rubenstein, supra, § 2.6, p. 84.

As Newberg on Class Actions discusses, disjuncture may be especially problematic in cases seeking equitable relief:

> Any plaintiff seeking injunctive relief typically must demonstrate that she will be subjected to the defendant's policy again in the future. This basic rule does not change for the class action plaintiff. When a named plaintiff in a class suit attempts to obtain an injunction due to the likelihood of future injury, that injury must be suffered personally by the named plaintiff—potential future injuries to class members do not provide standing for the named plaintiff to seek injunctive relief. Thus, a plaintiff who has suffered an actual injury but is unlikely to suffer further injury in the future may have standing to bring an individual or class claim for damages but be unable to seek equitable relief even if other class members are likely to suffer future injury.

Id. at 87.

The defendants argue three groups of proposed class members lack standing: (1) those not currently confined under North Dakota Century Code chapter 25-03.3; (2) those whose claims are based on past conduct for which no prospective relief can be granted; and (3) unknown future class members. (Doc. #361, p. 6). The court next analyzes standing as to each of those three groups.

## A.    Persons Not Currently Confined

The proposed classes include two groups of persons not currently confined as SDIs—those in the proposed Debt Class who have been discharged from SOTEP and those in the proposed DOCR Class who are currently in DOCR custody rather than in DHS custody.

## I.    Debt Class

In denying a motion to dismiss, the court previously found standing as to those who have been discharged from SOTEP, but from whom the defendants have demanded payment for their stays at NDSH. That ruling was based on DHS's statutory authority to seek recovery of the costs of SOTEP treatment for up to six years and on a demand for payment[4] "in the form of a dunning letter constitut[ing] a continuing injury for which the proposed class members have standing to seek injunctive relief." (Doc. #244, pp. 3-4).

Concerning the Debt Class, the defendants now argue that only those who have been discharged and are subject to a current demand for payment could have standing, and further argue that the plaintiffs have not identified any named plaintiffs or proposed class members who are currently subject to payment demands. (Doc. #361, p. 9). But, in fact, the plaintiffs' motion is supported by declarations of three SDIs discharged from SOTEP, each of whom describes a current demand for payment. Two describe notices that their bills had been referred to a collection agency. (Doc. #345-7, pp. 7-8; Doc. #345-11, p. 3). A declaration of another plaintiff describes NDSH having garnished over $70,000 from his Supplemental Security Income (SSI) benefits while he was confined at NDSH. (Doc. #345-2). The record shows another SDI having filed bankruptcy to discharge his debt to NDSH. (Doc. #344-34). At minimum, each of the three plaintiffs whose declarations describe a current demand for payment meets Lujan's three-part standing test. Thus, as to the proposed Debt Class, defendants' contention that standing is lacking should be rejected.

---

[4] Although NDSH bills SOTEP residents for their stays, no demand for payment is made until after an SDI is discharged from SOTEP. (Doc. #361, p. 9 n.2).

## II.    DOCR Class

Turning to the proposed DOCR Class, the court must determine whether any named plaintiff has individual standing as to claims against DOCR. An earlier order of the court discussed the plaintiffs' claims against DOCR:

> The procedural due process claim alleged by the plaintiffs concerns DOCR's pre-petition process. North Dakota law requires that approximately six months before the projected release date of an inmate, the department is to complete an assessment of the inmate to determine whether a recommendation is to be made to a state's attorney for civil commitment. If, after completion of the assessment, the department determines the inmate may meet the definition of a[n] SDI, the department is to refer the inmate to the state's attorney of a county. Following receipt of the referral, but at least 60 days before the inmate's release date, the state's attorney is to notify the DOCR and the attorney general whether the state's attorney intends to file a civil commitment petition. If the DOCR authorizes a petition, the district court determines whether the individual must be detained pending a commitment hearing.

> The plaintiffs maintain that this process unconstitutionally deprives them of liberty without notice because the DOCR does not inform an inmate of possible detention for commitment proceedings until immediately before the scheduled release date from DOCR custody. The lack of notice, according to plaintiffs, results in few contested probable cause hearings. Tied into this claim is plaintiffs' claim that the defendants have violated substantive due process rights because DOCR's referral process lacks a rational basis for utilizing "discredited actuarial instruments" in the selection of inmates to be referred for SDI proceedings. Although defendants contend the plaintiffs lack standing to bring such a claim because they are no longer in DOCR custody, it appears from the record that several SDI plaintiffs are, in fact, in DOCR custody. Moreover, the duration of time in which the inmate is in DOCR custody and aware of the potential SDI commitment proceedings is short. By the time the inmate in DOCR custody is aware of the referral, they are moved out of DOCR custody and in the midst of the process of being committed as an SDI. By statute, release of a potential SDI from DOCR custody for a SDI evaluation and committal as an SDI is approximately 60 days.

> The court finds the allegations in the complaint are sufficient to survive a motion to dismiss and that the plaintiffs alleging due process claims have standing to pursue them.

(Doc. #244, pp. 5-6).

That earlier order, in the context of a motion to dismiss, was based on information then in the record, with all reasonable inferences construed in the plaintiffs' favor. Now, however, the burden is on the plaintiffs to establish that they meet each of Rule 23's requirements, and that they meet standing requirements. The court must therefore consider the circumstances of the two plaintiffs proposed as DOCR Class representatives—Lester McGillis and Travis Wedmore—to determine whether either has standing to raise claims of the proposed DOCR Class. The record now includes declarations describing the DOCR custody status of both McGillis and Wedmore. (See Doc. #348; Doc. #350).

As the plaintiffs propose the DOCR Class, it would include those in DOCR custody "who have been or will be referred to a state's attorney for civil commitment." (Doc. #343, p. 2). As discussed above, DOCR is statutorily required to assess sex offenders prior to their release, to determine whether to refer an individual to a state's attorney for civil commitment. DOCR, is not, however, statutorily required to refer any individual for civil commitment.[5] Under the plaintiffs' proposed definition, only those who have been or will be referred for civil commitment—not those who will be assessed for referral—would be included in the DOCR Class.

Both McGillis and Wedmore are in DOCR custody because of criminal conduct—though not sexually predatory conduct—which occurred during their

---

[5] Although not required by statute, DOCR policy requires that persons who meet certain criteria be referred to a state's attorney, regardless of whether DOCR believes a person may be an SDI. If a person meets criteria of that DOCR policy, but DOCR does not believe that person is an SDI, DOCR contacts the state's attorney to advise of the offender's upcoming release. (Doc. #344, p. 4).

confinement at NDSH. McGillis' declaration states that he began serving a sentence in DOCR custody in October 2014, after a conviction for assault of an NDSH staff member. Also in October 2014, a state court judge determined that McGillis no longer meets the definition of an SDI and ordered him discharged from civil commitment. (Doc. #348, p. 5). Therefore, when his DOCR sentence is completed, McGillis is not scheduled to be returned to NDSH. Wedmore's declaration states that he is in DOCR custody because of a conviction for punching an NDSH staff person and that he will be returned to NDSH after completion of his DOCR sentence. (Doc. #350, pp. 1-2).

The plaintiffs argue that the risk of future injury—that is, the risk of DOCR referring them for civil commitment—confers standing on both Wedmore and McGillis. To meet <u>Lujan</u>'s standing test, a future injury must be "imminent" and "not conjectural or hypothetical." Thus, Wedmore and McGillis must show that the risk of DOCR again referring them for civil commitment is imminent, and not conjectural or hypothetical.

Wedmore is subject to an existing commitment order. The court conceives no reason why DOCR might refer someone subject to an existing commitment order for another commitment proceeding, and the plaintiffs' brief suggests no reason for doing so. Nor do the plaintiffs identify any circumstances in which a person situated similarly to Wedmore has been referred for another commitment proceeding. Consequently, this court cannot conclude that Wedmore is at imminent risk of being referred for another commitment proceeding, and must therefore conclude that he does not have standing to raise claims of the proposed DOCR Class.

Even though a state court has determined McGillis no longer meets the SDI criteria, the plaintiffs assert that he could again be subject to referral for another

commitment proceeding. According to a declaration of the plaintiffs' counsel, "several individuals have been committed as SDIs on two separate occasions and/or referred for possible commitment on more than one occasion." (Doc. #344, p. 11).

McGillis meets DOCR's definition of a sex offender,[6] so it is <u>possible</u> that he would be referred for another commitment proceeding, even though he is not currently serving a sentence for a sex-related offense. But, the plaintiffs have cited no instances in which DOCR has actually referred a person in custody for a non-sex related offense for a commitment proceeding. Nor have plaintiffs identified instances in which DOCR has referred someone whom a court has recently found to no longer meet the definition of an SDI for another commitment proceeding. The plaintiffs' theory that DOCR might refer McGillis for a commitment proceeding as the end of his current DOCR sentence nears is, in this court's opinion, conjectural and hypothetical.

In this court's opinion, none of the named plaintiffs currently in DOCR custody has standing to raise issues concerning DOCR's process for referral to a state's attorney for commitment proceedings.[7] They are in the situation <u>Newberg on Class Actions</u>

---

[6] DOCR's Policy 1A-16 includes within its definition of "sex offender" those who have a prior record of sex offenses and remain subject to sex offender registration laws, and those who have "any history of sexually predatory conduct." Information in the record does <u>not</u> suggest that McGillis would meet the policy's criteria for mandatory referral to a state's attorney discussed in footnote 5.

[7] The plaintiffs' brief refers to a third named plaintiff as also being in DOCR custody, but does not identify him as a proposed class representative. (Doc. #343-1, p. 32). That third plaintiff is referenced as Timothy Olafson, though that appears to be a typographical error. Andrew Olafson, but not Timothy Olafson, is a named plaintiff. The court is familiar with the circumstances of Andrew Olafson, who is a plaintiff in another case in this court. <u>See</u> <u>Olafson v. Schultz</u>, D.N.D. Case No. 3:14-cv-90. The record of that other case shows that Andrew Olafson is currently in DOCR custody because of convictions for assault and disorderly conduct relating to incidents that occurred while he was committed at NDSH. <u>Id.</u> at Doc. #16, p. 7. There is no information in the record

describes: "[A] plaintiff who has suffered an actual injury but is unlikely to suffer further injury in the future may have standing to bring an individual or class claim for damages but be unable to seek equitable relief even if other class members are likely to suffer future injury." Rubenstein, <u>supra</u>, § 2.7, p. 87.

Nor does any named plaintiff who is <u>not</u> currently in DOCR custody have standing; all have completed the commitment process, and there is no showing that any of them is at imminent risk of again being subject to referral for that process. Since there is no named plaintiff who has the requisite standing, this court recommends against certification of the proposed DOCR Class.

### B.  Claims Based on Past Conduct and Non-Parties' Conduct

One of the requirements for standing is redressability—the alleged injury must be one that would be addressed by a decision favorable to the plaintiff. In that context, the court considers the defendants' assertion that plaintiffs lack standing as to various claims based on past conduct. The defendants contend that standing cannot be found as to the claims based on: DOCR's referrals to state's attorneys, detention pending probable cause hearings, transfer to and confinement at NDSH for SDI evaluations, and confinement pending a commitment hearing. (Doc. #361, p. 9). The plaintiffs reply that, though they will offer evidence of past conduct, they seek only prospective relief. (Doc. #368, p. 6). By itself, the fact that claims are based on past conduct does not preclude prospective relief, and does not result in lack of standing.

---

suggesting that Olafson will not be subject to continuing commitment as an SDI after his DOCR custody ends. As it relates to the standing inquiry, Olafson's situation is no different from Wedmore's.

The defendants also contend that the proposed classes include persons whose claims are against non-parties. (Doc. #361, p. 10). In that regard, the defendants identify claims concerning conduct of those who ordered detention pending probable cause hearings, those who detained persons pending probable cause hearings, and those who ordered persons transferred to NDSH for SDI evaluations. The defendants argue that, in essence, the plaintiffs are improperly challenging past decisions of state judges and law enforcement personnel.[8] Id. The plaintiffs reiterate that they are alleging only current and imminent violations of their constitutional rights, (Doc. #368, p. 13 n.6), and the court has stated that it will not review state court decisions, (see Doc. #244, p. 3) ("The judicial commitment orders are not subject to review in this action."). The fact that the plaintiffs may offer evidence of conduct by, and decisions of, non-parties does not preclude prospective relief against the defendants and does not defeat standing.

## C. Future Class Members

The defendants argue that the proposed classes include unknown future class members who lack standing. (Doc. #361, p. 6). Though the class definitions which the plaintiffs have proposed do not explicitly include future members, the plaintiffs argue that the injunctive relief which they seek would benefit persons who do not come within a class definition at this time, but will in the future. The plaintiffs urge the court to consider those potential future beneficiaries in analyzing the impracticability of joinder of all class members. (Doc. #368, p. 6). It is within this context that the defendants assert that the proposed classes would include unknown future members.

_____

[8] In this regard, the defendants reassert application of the Rooker-Feldman doctrine. In the context of an argument that a motion to amend the complaint was futile, the court previously found the Rooker-Feldman doctrine did not deprive it of jurisdiction. (Doc. #99; Doc. #102).

A pending case involving Missouri's sex offender treatment program addressed concerns about inclusion of future class members:

> Plaintiffs seek prospective injunctive relief which, if granted, would presumably apply to future [Sexual Offender Rehabilitation and Treatment Services] residents. Therefore, the inclusion of "future" SORTS residents in the proposed classes is redundant and unnecessary, and could unduly complicate the proceedings. The Court will modify the proposed class definitions to restrict the classes to those who are, or will be *during the pendency of this action*, residents of SORTS.

Van Orden v. Meyers, No. 4:09CV00971, 2011 WL 4600688, at *4 (E.D. Mo. Sept. 30, 2011).

The plaintiffs suggest that the defendants' concerns about inclusion of future class members can be addressed in a manner similar to that employed in Van Orden. (Doc. #368, p. 7). This court agrees. Specifically, as to the Debt Class, the definition can be narrowed to include only those persons from whom DHS or NDSH has demanded payment from January 1, 2004, through the pendency of this action.[9] The definitions of the SOTEP Class, of each of the subclasses within the SOTEP Class, and of the Evaluation Class can be similarly narrowed, to include only persons subject to SOTEP commitments or evaluations during the pendency of this action.[10]

---

[9] Additionally, the plaintiffs offer to narrow the starting date for inclusion in the Debt Class to August 2008, six years prior to filing of the second amended complaint, if the defendants stipulate that they will make no attempt to collect from any SDIs discharged prior to August 2008. (Doc. #368, p. 4 n.3).

[10] Though this court recommends against certification of the proposed DOCR Class, if that class were certified, its definition could similarly be narrowed to limit it to those whom DOCR refers for civil commitment proceedings during the pendency of this litigation.

### D. Named Class Representatives

The defendants contend that there are not named representatives for some of the proposed classes. The defendants argue that no named plaintiff meets the criteria for a proposed Juvenile Subclass, as that subclass is described in the Sixth Amended Complaint. Further, they contend that the definition now proposed for the Juvenile Subclass is improper because it is different from that included in the complaint.[11] (Doc. #361, p. 11). Defendants cite no authority for the proposition that a class definition must mirror the definition pled in the complaint, and the court has identified no authority for that position.

District courts have certified classes defined differently than originally pled, and Rule 23(c)(1)(C) allows for amendment of a certification order at any time prior to final judgment. See, e.g., Hopkins v. Kan. Teachers Comm. Credit Union, 265 F.R.D. 483, 485 n.2 (W.D. Mo. 2010); In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 606 (D. Minn. 2001). The court therefore considers the Juvenile Subclass definition as proposed in the plaintiffs' motion, rather than as described in the complaint. As proposed in the motion, three named plaintiffs meet the definition for a Juvenile Subclass. (See Doc. #345-3; Doc. #345-9; Doc. #345-13). Each of the three—Jason Gores, Robert Lilley, and John Westlie—declare that they were committed as SDIs based on conduct which occurred while they were juveniles. Id.

---

[11] The Sixth Amended Complaint describes an "SDI Minors" subclass, to include persons who were minors at the time of SDI referral, detention, and/or commitment. (Doc. #246, p. 13). The subclass definition now proposed would include those whose commitment was based on sexually predatory conduct which was committed while they were minors, rather than on commitment proceedings occurring while they were minors.

As to the proposed ADA Subclass, the defendants argue that the plaintiffs have not proved that any proposed class member is under a disability, apart from a sexual behavioral disorder which is excluded from ADA coverage. (Doc. #361, p. 12). In support of this position, the defendants cite only <u>Belles v. Schweiker</u>, where the circuit court affirmed the district court's denial of class certification, stating:

> [The plaintiff] cannot identify any other person who has been subjected to the same or similar treatment as she has. She only speculates that such is the case. Proof of typicality requires more than general conclusory allegations.

720 F.2d 509, 515 (8th Cir. 1983).

In a declaration, plaintiffs' counsel states that review of SDIs' records has identified eleven who have disabilities. (Doc. #344, p. 16). Further, counsel assert they cannot identify additional potential ADA Subclass members because records of nonparty SDIs who have not signed releases are not available to them. (Doc. #368, p. 9). According to counsel's declaration, one of the proposed representatives of the ADA Subclass has been diagnosed as having psychotic disorders, and another has been diagnosed as having "borderline intellectual functioning and a pattern of cognitive deficits thought to be consistent with prenatal alcohol exposure." (Doc. #344, pp. 6, 9). Another plaintiff, who is not identified as a representative of the proposed ADA Subclass, is described as having been diagnosed with pervasive developmental disorder and mild mental retardation. <u>Id.</u> at 7. The declaration of counsel, an officer of the court, cannot be considered speculative or conclusory. The proposed ADA Subclass is not speculative under <u>Belles</u>, and the proposed representatives of that class meet requirements for standing.

The defendants have not raised standing issues as to representatives of the SOTEP Class, the RLUIPA Subclass, or the Evaluation Class. In this court's opinion, the plaintiffs have met standing requirements as to the following proposed classes and subclasses: SOTEP Class, Juvenile Subclass, RLUIPA Subclass, ADA Subclass, Evaluation Class, and Debt Class. There are named plaintiffs who have standing to assert the claims of each of those classes and subclasses.[12]

The court next considers whether the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—have been established as to each proposed class and subclass.

**2.      Rule 23(a)(1)—Numerosity**

The defendants argue that none of the proposed classes or subclasses meet Rule 23(a)(1)'s requirement that a class be "so numerous that joinder of all members is impracticable." A finding of numerosity does not depend solely on the number of members of a potential class. Indeed, the plaintiffs are not required to demonstrate that joinder of all members as named plaintiffs would be impossible; impracticability requires a showing that it would be extremely difficult or inconvenient to join all members of the class. Van Orden, 2011 WL 4600688, at *6; Hanson v. Acceleration Life Ins. Co., No. A3-97-152, 1999 WL 33283345, at *9 (D.N.D. Mar. 16, 1999).

---

[12] Class representatives for the SOTEP Class are David Anderson, Matthew Dyer, Jason Gores, Terry Greak, Robert Hoff, Robert Lilley, Oliver Wardlow, Travis Wedmore, and John Westlie. (Although Wedmore is currently in DOCR custody, he anticipates being returned to DHS custody at NDSH.) Class representatives for the respective subclasses are: ADA Subclass—Anderson, Gores, and Wardlow; Juvenile Subclass—Gores, Lilley, and Westlie; RLUIPA Subclass—Lilley. Class representative for the Evaluation Class is Eugene Hinson. Class representatives for the Debt Class are Rodney Ireland, Larry Rubey, and Jeremy Johnson. (Doc. #343).

*Newberg on Class Actions* suggests that "the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." Evans v. Am. Credit Sys., Inc., 222 F.R.D. 388, 393 (D. Neb. 2004) (citing 1 Herbert B. Newberg, Newberg on Class Actions, § 3.05).

In considering the numerosity factor, the Eighth Circuit has directed courts to analyze not only the number of persons in the class, but also the nature of the action, the size of the individual claims, the inconvenience of trying individual cases, and "any other relevant factor." Emanuel v. Marsh, 828 F.2d 438, 444 (8th Cir. 1987). If the case involves a request for broad-based declaratory and injunctive relief which would not be available to individual plaintiffs, that can weigh in favor of certification. Paxton v. Union Nat. Bank, 688 F.2d 552, 561 (8th Cir. 1982). Courts have found that, in certifying a class seeking only injunctive relief, the numerosity requirement can be met with a smaller class size, since "the benefits to be gained not only inure to the benefit of the known class but will benefit a future class of indeterminate size." San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio, 188 F.R.D. 433, 442 (W.D. Tex. 1999).

Some courts have considered fear of retaliation for litigation as a factor making joinder impracticable. Rubenstein, supra, § 3:12, p. 208. The plaintiffs urge the court to consider that factor, contending that they have "endured harassment by NDSH staff persons because of their participation in this suit." (Doc. #343-1, p. 14).

The defendants point to the large percentage of the proposed SOTEP Class and subclasses who are named plaintiffs, contending that shows that joinder of all class members is not impracticable. And, the defendants argue that those who have "made

27

the voluntary choice not to become embroiled in this litigation . . . should not be conscripted" to do so through class certification. (Doc. #361, p. 13). They argue those SDIs not named as plaintiffs should not be forced into the action; however, the defendants contend that class certification is not necessary because any injunctive relief will benefit SDIs not named as plaintiffs, along with the named plaintiffs. Thus, defendants argue that those not plaintiffs should not be required to be involved, even though they acknowledge they may be impacted by this litigation.

As to the SOTEP Class, the court has not identified any cases discussing the situation presented here—where up to one-half of the members of the proposed class are named plaintiffs. Although that factor could be interpreted to show that joinder of all class members is not impracticable, the court also considers the plaintiffs' evidence that fear of retaliation has kept some SDIs from joining as named plaintiffs. (Doc. #172, pp. 1-2; Doc. #172-3, p. 3; Doc. #295-1, p. 2; Doc. #307-2, p. 5).

In considering impracticability of joinder of all class members, the <u>Van Orden</u> court noted:

> It is clear that joining each of the putative plaintiffs individually and trying separate suits for each would be wasteful, duplicative, and time consuming. And, if each of the Plaintiffs' claims were tried individually, much of the evidence and many of the witnesses would be the same in each case, constituting a waste of judicial resources. Therefore, in this case joinder is "impracticable" and the numerosity requirement of Rule 23(a)(1) is satisfied.

<u>Van Orden</u>, 2011 WL 4600688, at *6. Considering the nature of the action, the inconvenience of trying individual cases, some potential class members' stated fear of retaliation, and that at least 50 persons would meet the class definition, the court recommends finding that the numerosity requirement for certification of a SOTEP Class has been satisfied.

At least 46 persons would meet the Debt Class definition, and the percentage of those persons who are named plaintiffs is lower than in the proposed SOTEP Class. Again, considering that the action is one seeking only injunctive relief, the size of the proposed class, and the inconvenience of trying individual cases, this court recommends finding the numerosity requirement satisfied as to the Debt Class.

If considered by itself, the proposed Evaluation Class—for which only five persons are currently eligible—would certainly not meet numerosity standards. However, considering it in the context of the litigation as a whole, this court nonetheless recommends that the numerosity factor be found satisfied for this class. The proposed Evaluation Class would be represented by Eugene Hinson, who was recently added as a named plaintiff. (Doc. #372). If an Evaluation Class were not certified, when Hinson's evaluation is completed, his request for relief concerning the evaluation process would be moot.[13] That might well result in a motion to add yet another plaintiff, so that another person then on evaluation status would have standing to raise the same claims. If the class is certified, however, an exception to the mootness doctrine would apply, and adding yet another plaintiff would not be necessary. Erwin Chemerinsky, Federal

---

[13] Although there is an exception to the mootness doctrine for claims capable of "repetition yet evading review," that exception applies only if "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007) (emphasis added) (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)); see also Iowa Prot. & Advocacy Servs. v. Tanager, Inc., 427 F.3d 541, 544 (8th Cir. 2005). As discussed in the order allowing Hinson to be added as a named plaintiff, absent certification, the "repetition yet evading review" exception would not apply in these circumstances, because the "same complaining party" requirement would not be satisfied.

Jurisdiction § 2.5, p. 133 (6th ed. 2012) ("Cases are not dismissed as moot if there are secondary or 'collateral' injuries, if . . . it is a properly certified class action suit.") Considerations of impracticability and judicial efficiency therefore weigh in favor of finding the numerosity factor satisfied despite the small size of the Evaluation Class.

In summary, the court recommends finding sufficient numerosity as to the following proposed classes: SOTEP Class, Debt Class, and Evaluation Class.[14]

Although it is generally required that each subclass independently satisfy each of the Rule 23 criteria, if the subclass members are members of a larger certified class, courts have applied the numerosity requirement less stringently. Rubenstein, supra, § 3:16, p. 223; Christina A. ex rel. Jennifer A. v. Bloomberg, 197 F.R.D. 664, 667-71 (D.S.D. 2000). All members of the three proposed subclasses would be members of the SOTEP Class. Although the subclasses would each be quite small in number, convenience and judicial economy support certifying them if a SOTEP Class is certified. Thus, if the SOTEP Class is certified, the three proposed subclasses—Juvenile, RLUIPA, and ADA, should also be considered to meet the numerosity requirement.

### 3.    Rule 23(a)(2)—Commonality

The commonality prong of Rule 23(a)(2) requires a showing of common questions of law or fact, the "determination of [which] will resolve an issue that is

---

[14] As to the proposed DOCR Class, the plaintiffs estimate class membership of 75 individuals. That estimate is based on the plaintiffs' review of the state sex offender website, which identified persons who are classified as "high risk" or "lifetime" sex offenders who are currently incarcerated at the NDSP. (Doc. #344, p. 16). As discussed above, however, it is this court's opinion that no named plaintiff has standing as a member of the proposed DOCR Class. But, in the event standing were found, a DOCR Class as proposed should be found to meet Rule 23(a)'s numerosity requirement.

central to the validity of each one of the claims in one stroke." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011). Claims of a class must "depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor" or "a uniform employment practice." <u>Id.</u> at 350, 355. But, not every question of law or fact need be common to every member of the class. <u>Paxton</u>, 688 F.2d at 561. Other courts have found sufficient commonality when the claims turn on whether a defendant's policies and procedures result in deprivations of the plaintiffs' constitutional rights. <u>Christina A.</u>, 197 F.R.D. at 667; <u>Lambertz-Brinkman v. Reisch</u>, No. CIV 07-3040, 2008 WL 4774895, at *2 (D.S.D. Oct. 31, 2008).

In arguing their positions on commonality, not surprisingly, the parties articulate the issues very differently. As the Eighth Circuit recently observed:

> How one articulates the claims in any given case could artfully carry the day on the issue of commonality, since any competently crafted class complaint literally raises common questions. But merely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2). Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.

<u>Ebert v. General Mills, Inc.</u>, 823 F.3d 472, 478 (8th Cir. 2016) (citations and internal quotation marks omitted).

As outlined above, <u>see</u> <u>supra</u> Plaintiffs' Claims, pp. 7-8, the plaintiffs' brief identifies 21 claims they assert are common to members of the various proposed classes. The defendants strenuously disagree, contending:

> the rigorous analysis as outlined by the United States Supreme Court to ensure that the requirements of Rule 23(a) are satisfied necessitates an examination of the individual background, diagnosis, medical history, behavior, treatment needs, treatment plans, treatment participation, applicable policy, and other individualized factors of each SOTEP resident to determine whether the claims, if proven, are capable of class wide resolution.

> Therefore, the <u>Rooker-Feldman</u> doctrine and the doctrine of *res judicata*, at the very least, impact the required prerequisite analysis of commonality by this Court because the analysis is very fact specific as it relates to each individual Plaintiff.

(Doc. #361, p. 19) (citation omitted). The plaintiffs reply that the individual circumstances of the SOTEP Class members "have no bearing on whether the North Dakota statute under which they are confined is unconstitutional." (Doc. #368, p. 12). Rather, the plaintiffs describe their intent to use evidence about individual SDIs as examples of alleged systematic deficiencies. <u>Id.</u>

As presented by the plaintiffs, the issues are similar to those found to satisfy commonality requirements in cases challenging sex offender treatment programs in two other districts in this circuit. <u>Van Orden</u>, 2011 WL 4600688, at *3; <u>Karsjens v. Jesson</u>, 283 F.R.D. 514, 518 (D. Minn. 2012) ("[T]he class members allege the same injuries—generally, the lack of treatment, inadequate conditions of confinement, and lack of meaningful opportunity for release."). Considering the standards established by the Supreme Court and the Eighth Circuit, the court recommends finding sufficient commonality as to the SOTEP Class and its subclasses, the Evaluation Class, and the Debt Class.[15]

**4.  Rule 23(a)(3)—Typicality**

Under Rule 23(a)(3), claims of class representatives must be typical of those of other members of the class. This typicality requirement is generally considered satisfied if the claims of the named representatives and the other class members "stem from a

---

[15] If standing were found as to the DOCR Class, commonality should similarly be found to be sufficient as to that class.

single event or are based on the same legal or remedial theory." <u>Paxton</u>, 688 F.2d at 561-62. "Commonality and typicality tend to merge because both 'serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" <u>Karsjens</u>, 283 F.R.D. at 519 (quoting <u>Duke</u>, 564 U.S. at 349 n.5). The Eighth Circuit has analyzed typicality in terms of whether there are other class members who have the same or similar grievances as the named plaintiffs. <u>Donaldson v. Pillsbury Co.</u>, 554 F.2d 825, 830 (8th Cir. 1977).

Recognizing the principle that commonality and typicality tend to merge, the defendants' contentions as to lack of typicality mirror their contentions as to lack of commonality. In essence, they argue that the fact finder will need to make a "case-by-case determination as to whether each individual Plaintiff's constitutional rights were violated and whether that Plaintiff is entitled to specific relief." (Doc. #361, p. 23).

The named plaintiffs and the putative class members allege constitutional violations arising from the same policies and conditions. The alleged constitutional violations are based on the same legal theories and involve the same requested legal remedies. <u>See Karsjens</u>, 283 F.R.D. at 519; <u>Van Orden,</u> 2011 WL 4600688, at *8. This court recommends finding sufficient typicality as to the SOTEP Class and each of its subclasses, as to the Evaluation Class, and as to the Debt Class.[16]

---

[16] Again, if standing were found as to the proposed DOCR Class, the typicality requirement should be considered to have been satisfied.

## 5.    Rule 23(a)(4)—Adequacy of Representation

There are two components to Rule 23(a)(4)'s requirement for adequate representation. First, the interests of the class representatives and the interests of the unnamed plaintiffs must be coextensive and not antagonistic to each other. <u>Van Orden</u>, 2011 WL 4600688, at *9 (citing <u>Rentschler v. Carnahan</u>, 160 F.R.D. 114, 116 (E.D. Mo. 1995)); <u>Halvorson</u>, 718 F.3d at 777. Second, the plaintiffs' counsel must be fully competent to prosecute the matter as a class action.

The defendants do not question the adequacy of the representation factor as to plaintiffs' counsel. But, the defendants argue that the named plaintiffs have not demonstrated that they will adequately represent the interests of the class, "because individual incentives to press issues important to that specific Plaintiff will impair the ability to raise the issues important to other members of the class." (Doc. #361, pp. 24-25). In making that assertion, the defendants cite no facts specific to this case. And, each of the proposed class representatives has signed a declaration which confirms an understanding of obligations of a class representative and a promise to fulfill those obligations. (Doc. #345-1, p. 4; Doc. #345-2, p. 6; Doc. #345-3, p. 3; Doc. #345-4, p. 6; Doc. #345-5, p. 6; Doc. #345-6, p. 3; Doc. #345-7, p. 8; Doc. #345-8, p. 4; Doc. #345-9, p. 5; Doc. #345-10, p. 5; Doc. #345-11, p. 3; Doc. #345-12, p. 5; Doc. #345-13, p. 11; Doc. #348, p. 8; Doc. #350, pp. 2-3).

Plaintiffs' counsel have significant experience with class actions, including class actions challenging policies of governmental agencies and other class actions in this district. (Doc. #344, pp. 17-18). They agreed to undertake this representation more than three years ago, and have demonstrated their willingness to vigorously protect their

clients' interest throughout the course of the litigation to date. Considering the factors of Rule 23(g)(1)(A), their appointment as class counsel is in order.

There is no issue as to plaintiffs having met Rule 23(a)(4)'s requirement for adequacy of representation as to any of the proposed classes or subclasses.

## 6.     Rule 23(b)(2)—Appropriateness of Injunctive Relief

Since they assert application of Rule 23(b)(2), the plaintiffs must show that the defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The defendants contend that the plaintiffs' claims lack the cohesiveness required by Rule 23(b)(2), again relying on their assertion that the plaintiffs' claims "depend[] heavily on case-by-case analysis and [are] extremely fact intensive." (Doc. #361, p. 26). Additionally, the defendants point to a paragraph in the Sixth Amended Complaint's prayer for relief which asks for "any other relief deemed just and appropriate, <u>including prospective monetary relief</u> but only to the extent that any defendant is not entitled to absolute or qualified immunity." (Doc. #246, p. 87) (emphasis added). Though the complaint includes that single reference to monetary relief, the plaintiffs have consistently stated that they seek only injunctive relief. Their brief in support of the motion for class certification confirms they request no monetary relief. (Doc. #368, p. 10).

The plaintiffs challenge policies and practices alleged to have been generally applied to the putative classes. In this court's opinion, the injunctive and declaratory relief which the plaintiffs are seeking makes certification pursuant to Rule 23(b)(2) appropriate.

# Conclusion

In recommending certification of some of the proposed classes, the court is mindful of the fact that class certification decisions are "necessarily prospective and subject to change." Van Orden, 2011 WL 4600688, at *19; In re Zurn Pex Plumbing Prod. Liab. Litig., 644 F.3d 604, 613 (8th Cir. 2011). The court is also mindful that the Supreme Court has directed that district courts are to "give the benefit of the doubt" to certifying a class. Amgen Inc., 133 S. Ct. at 1194-95. With those factors in view, and considering the various factors discussed throughout this opinion, the court **RECOMMENDS** certification of the following classes and subclasses:

(1)  SOTEP Class, consisting of all persons civilly committed to the DHS pursuant to North Dakota Century Code chapter 25-03.3 and confined in the Sex Offender Treatment and Evaluation Program at NDSH during the pendency of this litigation, with subclasses consisting of:

   (a)  all SOTEP Class members with disabilities as defined under the Americans with Disabilities Act (ADA Subclass);

   (b)  all SOTEP Class members whose civil commitment was based on "sexually predatory conduct" (as defined by North Dakota Century Code section 25-03.3-01(9)) committed while they were minors (Juvenile Subclass); and

   (c)  all SOTEP Class members whose religious exercise has been substantially burdened while civilly committed (Religious Land Use and Institutionalized Persons Act, or "RLUIPA" Class);

(2)  Evaluation Class, consisting of all persons in custody at NDSH for evaluation as to whether they are SDIs pursuant to North Dakota Century Code section 25-03.3-11, during the pendency of this litigation; and

(3)  Debt Class, consisting of all persons from whom DHS or NDSH has demanded payment January 1, 2004, through the pendency of this litigation, for their civil commitment as SDIs pursuant to North Dakota Century Code chapter 25-03.3.[17]

---

[17] In the event the defendants stipulate that they will engage in no efforts to collect payments from those discharged more than six years before the Second Amended

The court further **RECOMMENDS** that Brancart & Brancart and the Fremstad Law Firm be appointed as class counsel for the classes and subclasses described above, and that the individuals whom the plaintiffs have proposed be appointed as representatives of those classes and subclasses. Under Rule 23(c)(1)(B), the court **RECOMMENDS** that the claims of the classes and subclasses be preliminarily defined to include those set forth above, see supra Plaintiffs' Claims, pp. 7-8, with the exception of the claim that DOCR violated SDI's procedural and substantive due process rights by using a referral process that lacks a rational basis.

Finally, the court **RECOMMENDS** that plaintiff's motion be denied as to the proposed DOCR Class.

Dated this 29th day of August, 2016.

/s/ *Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

### NOTICE OF RIGHT TO OBJECT

Pursuant to Rule 72(b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **September 10, 2016**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

Complaint was filed, the starting date for inclusion in this class should be August 27, 2008, rather than January 1, 2004.