## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Rodney J. Ireland, Lester McGillis, Gerald )
DeCoteau, William Carter, Ryan Corman, )
Matthew Graham, Terry Greak, Glenn )
Halton, Robert Hoff, Monte Hojian, )
Jeremy Johnson, Michael Kruk, Garrett )
Loy, Kevette Moore, Cruz Muscha, Darin )
Napier, Paul Oie, Timothy Olpin, Larry )
Rubey, Christopher Simon, Kelly Tanner, )
John Westlie, Robert Lilley, Darl Hehn, )
Oliver Wardlow, Joshua Keeping, Matthew )
Dyer, Travis Wedmore, Kyle Aune, )
Marcus Bartole, Jason Gores, Estel Naser, )
Andrew Olafson, Stanton Quilt, Raymond )
Voisine, Eugene Wegley, David Anderson, )
Eugene Fluge, Robert Beauchamp, Sandy )
Mangelsen, and Eugene Hinson, )
                                   )
        Plaintiffs, )
                              )          Case No.  3:13-cv-3
    vs. )
                              )  **REPORT AND RECOMMENDATION**
Maggie D. Anderson, Executive Director, )     **ON CROSS-MOTIONS FOR**
North Dakota Department of Human )    **PARTIAL SUMMARY JUDGMENT**
Services, in her official capacity, Leann )
Bertsch, Director, North Dakota )
Department of Corrections and )
Rehabilitation, in her official capacity, )
State of North Dakota, North Dakota )
Department of Human Services, North )
Dakota Department of Corrections and )
Rehabilitation, North Dakota State )
Hospital, and Dr. Rosalie Etherington, )
Superintendent of the North Dakota State )
Hospital, in her official capacity, )
                                     )
        Defendants. )

      Forty-one named plaintiffs challenge various aspects of North Dakota's system

for civil commitment of persons who have been found to be sexually dangerous

individuals (SDIs). They bring claims for injunctive relief against three state

entities—the Department of Human Services (DHS), the North Dakota State Hospital

(NDSH), and the Department of Corrections and Rehabilitation (DOCR)—and the directors of each of those entities.

The defendants filed a motion for partial summary judgment, and the plaintiffs filed a cross-motion for partial summary judgment. In their briefing, the plaintiffs state that they do not intend to pursue some of the claims on which the defendants seek partial summary judgment. The issues remaining concern questions of facial validity of certain provisions of the statutory framework governing North Dakota's SDI system, and raise issues of denial of equal protection and denial of substantive due process.

Additionally, the plaintiffs move to strike a document submitted by the defendants in support of their position on the motions, contending that the information compiled in that document was requested, but not produced, in response to discovery requests.

## Summary

Some of the issues raised in the defendants' motion are no longer contested, and the defendants should therefore be granted partial summary judgment as to those issues. Earlier motions to dismiss plaintiffs who are no longer civilly committed were denied, and this court recommends that the defendants' motion for summary judgment on the claims of Larry Rubey be denied for the same reasons. To the extent the remaining issues require determination of the standard of review to be employed in reviewing constitutional claims of SDIs, this court recommends application of a rational basis standard.

As to the plaintiffs' Eighth Amendment claims, this court recommends that the defendants' motion for partial summary judgment be denied insofar as it concerns those

plaintiffs whose only sexually predatory conduct occurred while they were juveniles, but that defendants be granted partial summary judgment on the plaintiffs' other Eighth Amendment claims.

As to the plaintiffs' claim that the statutes governing civil commitment of SDIs violate their right to equal protection, insofar as SDIs are treated differently than persons who are civilly committed for treatment for serious mental disorders or chemical dependency, this court recommends that the defendants' motion for partial summary judgment be granted.

Because no plaintiff has standing to raise the claim, this court recommends that the plaintiffs' cross-motion for partial summary judgment be denied, insofar as it concerns a claim that chapter 25-03.3 is facially unconstitutional because it allows SDI commitment <u>both</u> without a prior criminal conviction and without requiring proof beyond a reasonable doubt of sexually predatory conduct.

Finally, this court recommends that the plaintiffs' cross-motion for partial summary judgment be granted, insofar as it concerns a claim that North Dakota Century Code chapter 25-03.3 is unconstitutional on its face, because it does not require that the defendants initiate court proceedings for release of individuals who no longer meet SDI criteria.

## Background

Another recent Report and Recommendation, regarding a pending motion for class certification, summarized relevant background information:

> North Dakota, like at least twenty other states, has adopted a statutory process for civil commitment of SDIs. <u>See</u> N.D. Cent. Code ch. 25-03.3. Under that statutory framework, a state's attorney can initiate a civil commitment

proceeding by filing a petition with a district court. Id. § 25-03.3-03(1). If a petition is filed, the person alleged to be an SDI has a statutory right to notice, a right to counsel, a right to a hearing, and a right to services of an expert witness at state expense. Id. §§ 25-03.3-09 to -13.

The SDI civil commitment process usually begins while a person is serving a prison term in custody of the DOCR. If a person who has been convicted of "an offense that includes sexually predatory conduct" is in DOCR's custody, DOCR is required to assess the person and to decide whether to recommend civil commitment as an SDI. Id. § 25-03.3-03.1(1). DOCR's assessment is to occur approximately six months prior to the person's projected date of release from custody. If DOCR determines that a person may meet the statutory definition of an SDI, DOCR is required to refer that person to one or more state's attorneys for possible civil commitment proceedings. Id. § 25-03.3-03(2). If a state's attorney files a petition after getting DOCR's recommendation, the person is transferred from DOCR custody to custody of the county where the petition was filed, pending a preliminary hearing. Id. § 25-03.3-03.11.

At a preliminary hearing, the state court determines whether there is probable cause to believe the individual is an SDI. If the court does not find probable cause, the petition is dismissed. Id. If the state court finds probable cause, the person is transferred to the North Dakota State Hospital (NDSH) for evaluation. Following evaluation, the state district court conducts a commitment hearing. The governing statute provides that a commitment hearing is to be held within 60 days of a finding of probable cause, unless the court finds good cause to extend that time. Id. § 25-03.3-13. But, declarations in the record describe plaintiffs being in the evaluation process at NDSH for as long as 197 days, 234 days, and 1 year. (Doc. #345-2, p. 2; Doc. #345-4, p. 2; Doc. #345-5, p. 2).

At a commitment hearing, the state has the burden to prove, by clear and convincing evidence, that the person meets the statutory definition of an SDI. To meet that burden, the state must prove (1) that the person has engaged in sexually predatory conduct, (2) that the person has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or another mental disorder or dysfunction, and (3) that the disorder makes that person likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. N.D. Cent. Code § 25-03.3-01(8).

Under North Dakota's system, individuals who are found to be SDIs are committed to the custody of the Department of Human Services (DHS) for placement in "an appropriate facility or program at which treatment is available." Id. § 25-03.3-13. The placement is to be in the "least restrictive

available treatment facility or program necessary to achieve the purposes of [the SDI statutes]," though DHS is not required to "create a less restrictive treatment facility or treatment program specifically for [a] respondent or committed individual." Id.

Upon their commitment, DHS places SDIs in a facility on the NDSH campus—the Gronewald/Middleton Building. (Doc. #246, p. 27). DHS may initiate a petition seeking a court's approval for a community placement—rather than placement at NDSH—but an SDI may not petition for community placement, and the state courts have determined that a court cannot order community placement in the absence of a DHS request. N.D. Cent. Code § 25-03.3-24(1); In re Whitetail, 868 N.W.2d 833, 840 (N.D. 2015). SDI treatment stages are described in a resident handbook, and it appears that handbook contemplates a minimum of two to three years to complete the treatment program. (Doc. #344-3, pp. 15-23).

The governing statutes require that an individual who is committed as an SDI have an annual examination, with an exam report to be provided to the court that ordered the commitment. If an SDI is indigent, the statutes also give the SDI a right to an annual examination by a court-appointed expert at state expense. N.D. Cent. Code § 25-03.3-17(2). After receiving an annual report, the court may order further examination and may hold a hearing to determine whether the commitment should continue. Id. § 25-03.3-17(4).

Once committed, an SDI remains committed indefinitely, unless a court orders discharge. Discharge petitions can be initiated by an SDI or by DHS. Id. § 25-03.3-17(5). There is a statutory requirement that an SDI receive annual notice of the right to petition for discharge, id. § 25-03.3-18(1), and an SDI is entitled to a discharge hearing every twelve months, id. § 25-03.3-18(2). At a hearing on a discharge petition, the SDI again has a right to a court-appointed expert at state expense. Id. § 25-03.3-18(3). In a discharge hearing, as in an initial commitment hearing, the state must prove, by clear and convincing evidence, that the person meets the statutory definition of an SDI. Id. § 25-03.3-18(4). Both initial orders for commitment as an SDI and orders denying petitions for discharge are appealable to the state supreme court. Id. § 25-03.3-19.

North Dakota began implementation of chapter 25-03.3 in 1997 through its Sex Offender Treatment and Evaluation Program (SOTEP). According to the defendants, approximately 170 individuals have been evaluated by SOTEP to date, and approximately 100 of those individuals have been committed as SDIs. (Doc. #361, pp. 6-7). Of those who have been committed, approximately 46 were subsequently discharged from NDSH. Id. . . .

The plaintiffs' compilation of discovery data, which defendants have not questioned, shows that, of those currently confined at NDSH as SDIs, over half have been there for 8 or more years, and at least 25% have been there more than 10 years. Id. at 1.

(Doc. #394, pp. 2-6) (footnote omitted).

## Summary of Issues Presented

First, the defendants move for dismissal of Larry Rubey's claims, because he was released from DHS custody pursuant to a June 23, 2015 state court order. An earlier order of this court, however, denied motions to dismiss as to other persons who are no longer in DHS custody. (Doc. #244, p. 4). The motion as to Rubey should be denied for the same reasons, and is not further addressed in this opinion.

Next, the defendants move for summary judgment on claims concerning the six plaintiffs who comprise the plaintiffs' proposed Juvenile Subclass. (Doc. #249, pp. 11-16); (see also Doc. #343, p. 3). The defendants assert that, contrary to contentions in the Sixth Amended Complaint, none of those six plaintiffs were juveniles at the time of their commitment proceedings. In filings subsequent to the Sixth Amended Complaint, the plaintiffs have focused their claims regarding these six plaintiffs on them being juveniles at the time of the sexually predatory conduct which led to their commitment as SDIs, rather than at the time of their commitment proceedings. The plaintiffs no longer allege that any of the six were juveniles at the time of their commitment proceedings, (Doc. #367, p. 4), and the defendants should be granted summary judgment dismissing all claims based on allegations that the six plaintiffs were juveniles when committed as SDIs.[1] This issue is not further addressed in this opinion.

---

[1] The defendants' motion does not address the plaintiffs' claims based on juvenile status at the time of the sexually predatory conduct, but defendants' reply brief states

Next, the defendants seek summary judgment on the plaintiffs' Eighth Amendment claims, insofar as the plaintiffs assert that civil commitment of a person who has not been convicted of a sex offense constitutes cruel and unusual punishment. In their response, the plaintiffs state that, assuming the SDI system is considered civil in nature and not punitive in nature, for purposes of this motion they concede that the Eighth Amendment's prohibition of cruel and unusual punishment does not apply, except as to those whose SDI commitment was based on sexually predatory conduct committed while they were juveniles. (Doc. #367, p. 31). The Eighth Amendment issue as to the proposed Juvenile Subclass is addressed below, but the other Eighth Amendment claims included in the Sixth Amended Complaint are not further addressed in this opinion.

Next, the defendants seek summary judgment on two equal protection claims—that SDIs are treated differently from persons who have been criminally convicted and incarcerated, and that SDIs are treated differently from persons who are civilly committed because of serious mental disorders or chemical dependency (persons requiring treatment, or PRTs, under North Dakota Century Code chapter 25-03.1). Plaintiffs respond that they do not intend to pursue an equal protection claim comparing SDIs to those who are incarcerated, id. at 4, so summary judgment should be granted as to that claim, and it is not further addressed in this opinion. The plaintiffs' equal protection claim concerning SDIs and PRTs is addressed below.

---

that they may bring a future motion addressing those claims. (Doc. #383, p. 4 n.1).

The defendants also seek summary judgment as to the plaintiffs' facial challenges to those portions of North Dakota Century Code chapter 25-03.3 which (1) allow indefinite civil commitment of SDIs; (2) provide for a "clear and convincing" standard of proof for SDI commitment; (3) concern the judicial release process; and (4) do not provide a right to jury trial in SDI commitment proceedings. The plaintiffs respond that they do not intend to pursue claims regarding lack of a jury trial, id. at 2, so summary judgment should be granted as to that claim. The defendants' motion as to other facial challenges to the statute is addressed below.

Finally, the defendants request summary judgment on the plaintiffs' claims that SDI commitment in the absence of a criminal conviction violates due process. The plaintiffs cross-move for partial summary judgment, contending that chapter 25-03.3 is unconstitutional on its face in not requiring proof of a criminal conviction for an SDI commitment, while at the same time allowing proof of sexually predatory conduct which forms the basis for an SDI commitment to be based on a "clear and convincing" standard rather than a "beyond a reasonable doubt" standard. Those issues are addressed below.

The plaintiffs also seek partial summary judgment on their claim that chapter 25-03.3 is unconstitutional on its face in not imposing a duty on DHS to take affirmative action to release individuals who no longer satisfy criteria for SDI commitment. That issue is addressed in conjunction with the defendants' motion concerning constitutionality of indefinite civil commitment, the defendants' motion concerning judicial release process, and the plaintiffs' motion to strike an exhibit to an affidavit.

## Law and Discussion

Summary judgment should be granted if, drawing all inferences in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Except as to DHS practices concerning release of committed individuals who no longer meet the SDI definition, the parties raise no factual disputes in the instant motions.

In this litigation, the plaintiffs bring substantive due process claims, with the primary contention that the defendants apply chapter 25-03.3 in a manner that results in the system being punitive in nature; if the court concludes that is true, the plaintiffs will then argue that constitutional protections applicable to criminal statutes must be applied. (Doc. #367, p. 3). But, for purposes of the instant motions, the plaintiffs assume that standards applicable to a system of civil commitment apply.

Consideration of the issues raised in the pending motions is guided by Kansas v. Hendricks, where the Supreme Court upheld Kansas statutes governing civil commitment of "sexually violent predators."[2] In doing so, the Court stated:

> Although freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, that liberty interest is not absolute, . . . and [i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty.

521 U.S. 346, 356 (1997). The purpose of civil commitment, however, cannot be

---

[2] Statutory terminology varies among the states—e.g., sexually violent predator, sexually violent person, sexually dangerous individual, sexually dangerous person, dangerous sexual offender, sexual psychopath. When not specifically discussing the North Dakota statute, this opinion uses the term "sex offender" to encompass the varied terms used in other states.

punitive, and involuntary commitment is constitutional only if a state employs proper procedures and evidentiary standards. Id. at 357. Under Hendricks, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." Id. at 358. Rather, proof of dangerousness must be coupled with proof of "some additional factor, such as a 'mental illness' or 'mental abnormality.'" Id.

In addition to Hendricks, both parties cite two recent cases involving sex offender commitment systems in other states in this circuit. In Van Orden v. Schafer, the court found that the "overwhelming evidence at trial" showed that Missouri's sex offender commitment system "suffers from systemic failures regarding risk assessment and release that have resulted in the continued confinement of individuals who no longer meet the criteria for commitment, in violation of the Due Process Clause." 129 F. Supp. 3d 839, 844 (E.D. Mo. 2015), on reconsideration in part sub nom. Orden v. Schafer, No. 4:09-cv-971, 2015 WL 9269251 (E.D. Mo. Dec. 21, 2015). In the same post-trial order, however, the court denied relief on (1) the plaintiffs' claims that the state statute was facially unconstitutional; (2) the plaintiffs' challenge to the constitutional adequacy of treatment modalities because of staff and funding shortages; and (3) the plaintiffs' challenge to the state's reimbursement scheme. Id. at 865-70. The Van Orden court declined to apply a strict scrutiny standard; rather, in considering the plaintiffs' as-applied claims, the court applied a "shocks the conscience" standard, and required that the plaintiffs prove that the "nature and duration of the commitment of [sex offenders] bears no reasonable relation to the non-punitive purpose for which they were committed." Id. at 867.

Unlike the Van Orden court, the court in Karsjens v. Jesson, applied a strict scrutiny standard, and found that Minnesota's sex offender civil commitment scheme was unconstitutional both on its face and as applied. 109 F. Supp. 3d 1139, 1166-67 (D. Minn. 2015), appeal docketed, No. 15-3485 (8th Cir. argued Apr. 12, 2016). The court found the Minnesota statutes facially unconstitutional in (1) not requiring periodic risk assessments; (2) providing no judicial bypass mechanism for plaintiffs to challenge their ongoing commitment outside the statutory discharge process; (3) making the statutory discharge criteria more stringent than the statutory commitment criteria; (4) authorizing the burden to petition for a reduction in custody to shift to committed individuals; (5) contemplating, but not providing, less restrictive alternatives; and (6) not requiring the state to take affirmative action on behalf of individuals who no longer meet criteria for commitment. Id. at 1173. Further, the court found Minnesota's system unconstitutional as applied in (1) not conducting periodic independent risk assessments; (2) not performing risk assessments in a constitutional manner; (3) continuing confinement of individuals who had completed treatment or sufficiently reduced their risk; (4) discharge procedures not working properly; (5) having insufficient less restrictive alternatives; and (6) the treatment program's structure being an "institutional failure," with "no meaningful relationship between the treatment program and an end to indefinite detention." Id. at 1173-74.

The plaintiffs also cite a recent decision from the Northern District of Iowa, Willis v. Palmer, No. C12-4086, 2016 WL 1267766 (N.D. Iowa Mar. 30, 2016), involving claims of nine individuals who were civilly committed to Iowa's sex offender treatment program. As to the plaintiffs' claims that the Iowa program violated the Fourteenth

Amendment, the court applied a "shocks the conscience" standard, and denied summary judgment as to claims that the treatment was inadequate, that the system was punitive as applied, and that the program was the least restrictive means to achieve the state's goals. Id. at *27.

## 1.    Facial Invalidity

Claims that a statute is unconstitutional on its face are disfavored for several reasons.[3] Such claims may risk a premature interpretation of statutes on "factually barebones records," are contrary to the fundamental principle of judicial restraint, and frustrate the intent of the legislative body. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51 (2008) (citations and internal quotation marks omitted). Recently, the Supreme Court stated:

> A facial challenge is an attack on a statute itself as opposed to a particular application. While such challenges are "the most difficult . . . to mount successfully," the Court has never held that these claims cannot be brought under any otherwise enforceable provision of the Constitution. Instead, the Court has allowed such challenges to proceed under a diverse array of constitutional provisions.

City of Los Angeles v. Patel, 135 S. Ct. 2443, 2449 (2015) (citations omitted).

---

[3] The plaintiffs assert that the defendants' motion on facial invalidity claims is of "limited utility" at this stage, because any issues on which the defendants' motion is granted will also be presented as challenges to the statutes as applied. In the plaintiffs' view, "any facial analysis would be better presented in conjunction with the factual record, still being developed, so that the statute and system administering that statute could be reviewed and understood as a whole." (Doc. #367, p. 3). But, the plaintiffs nonetheless assert facial invalidity claims in their cross-motion.

The court has granted the plaintiffs several extensions of time to respond to the defendants' motion, so that further discovery could be conducted. The defendants have not completed required document production, and the court recognizes that the plaintiffs were required to respond to the defendants' motion before that was complete.

The parties disagree on the standard to be employed in determining whether portions of chapter 25-03.3 are unconstitutional on their face. In <u>United States v. Salerno</u>, a facial challenge to the federal Bail Reform Act as violative of substantive due process rights, the Supreme Court stated the challenger was required to "establish that no set of circumstances exists under which the [statute] would be valid." 418 U.S. 739, 745 (1987). The plaintiffs refer to a Tenth Circuit case[4] which questions the breadth of proper application of <u>Salerno</u>'s test, and point to the <u>Patel</u> Court's recent guidance on analysis of facial challenges:

> Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications." <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed.2d 151 (2008). But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct. . . . The "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." [<u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833, 894 (1992)].

135 S. Ct. at 2451. The plaintiffs argue, "Where a statute fails to provide constitutionally required substantive or procedural protections, the fact that the statute does not explicitly prohibit those protections cannot protect against a facial challenge." (Doc. #367, p. 24).

Along with their reliance on <u>Salerno</u>'s "no set of circumstances" language, the defendants also point to language of <u>Washington State Grange</u>, where the Court stated, "While some Members of the Court have criticized the <u>Salerno</u> formulation, all agree

---

[4] <u>Doe v. City of Albuquerque</u>, 667 F.3d 1111, 1123-28 (10th Cir. 2012).

that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'
Washington's primary system survives under either standard . . . ." 552 U.S. at 449
(emphasis added) (quoting Washington v. Glucksberg, 521 U.S. 702, 739-40 and n.7
(1997 ) (Stevens, J., concurring)). The defendants criticize the plaintiffs' failure to
address the plainly legitimate sweep standard. (Doc. #383, p. 17). However, Washington
State Grange addressed a First Amendment issue, and, though not entirely clear, it
appears that the Eighth Circuit reserves the "plainly legitimate sweep" test for First
Amendment overbreadth challenges.[5] Since the pending motions involve no First
Amendment questions, this opinion analyzes the facial challenges under the standard
recently described in Patel, without regard for the "plainly legitimate sweep" standard.

2.    **Standard of Review on Equal Protection and Substantive Due Process Claims**

As discussed above, the Karsjens and Van Orden courts reached differing
conclusions on the standard to be applied in analyzing constitutional claims of civilly
committed sex offenders. In concluding that the strict scrutiny standard applied, the
Karsjens court found that the plaintiffs' "fundamental right to live free of physical

---

[5] The Eighth Circuit discussed both standards in Neely v. McDaniel, a habeas case challenging Arkansas' statute criminalizing solicitation of sexual indecency with a child. 677 F.2d 346 (8th Cir. 2012). Neely challenged the statute as unconstitutionally vague on its face under the due process clause, and facially violative of the First Amendment because of overbreadth. In addressing the due process challenge, the court stated, "To succeed on his facial challenge to the statute, Neely must establish that 'no set of circumstances exists under which the Act would be valid.'" Id. at 350 (quoting Salerno, 481 U.S. at 745). But, in addressing the First Amendment challenge, the court stated, "The overbreadth doctrine permits a court to invalidate a statute that restricts expression if 'a substantial number of its applications are unconstitutional' in relation to its 'plainly legitimate sweep.'" Id. (quoting United States v. Stevens, 559 U.S. 460, 473 (2010)).

restraint [was] constrained by the curtailment of their liberty." 109 F. Supp. 3d at 1167.

Karsjens distinguished other cases challenging sex offender commitment schemes,

because no offender had ever been released from the Minnesota treatment program:

> This case is distinguishable from other challenges to the involuntary confinement of sex offenders where it was represented to the court that the program's anticipated duration of completion was a few years or only *potentially* indefinite; here, not one offender has been released from the [Minnesota Sex Offender Program] after over twenty years. See, e.g., Kansas v. Hendricks, 521 U.S. 346, 364 (1997) (stating that "commitment under the Act is only *potentially* indefinite" because "[t]he maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year" and "[i]f Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement"); In re Linehan, 557 N.W.2d 171, 188 (Minn. 1996) (finding that "model patients" were expected to complete the program in approximately thirty-two months and finding that, in light of this finding, the program was remedial and not punitive in nature); Call [v. Gomez, 535 N.W.2d 312, 318 n.5 (Minn. 1995)] (noting the state's representation that "[a]n average patient is expected to complete the program in a minimum of 24 months").
>
> . . . .
>
> The United States Supreme Court has held that a civil commitment statutory scheme is permitted provided that an individual is not detained past the time they are no longer dangerous or no longer have a mental illness without rendering the statute punitive in purpose or effect as to negate a legitimate nonpunitive civil objective. See Hendricks, 521 U.S. at 361-62. Thus, where, notwithstanding a "civil label," a statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal proceedings for constitutional purposes." Id. at 361. Moreover, "[i]f the object or purpose" of a civil commitment law is to provide treatment, "but the treatment provisions were adopted as a sham or mere pretext," such a scheme would indicate "the forbidden purpose to punish." Id. at 371 (Kennedy, J., concurring).

109 F. Supp. 3d at 1167-68.[6]

---

[6] An appeal of the Karsjens decision is pending, and one of the issues on appeal is application of the strict scrutiny standard.

In declining to follow <u>Karsjens</u>' application of strict scrutiny, the <u>Van Orden</u> court

explained:

> The United States Supreme Court has "repeatedly recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979). But it has never held that strict scrutiny applies to civil commitment statutes. <u>See</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 356 (1997) ("Although freedom from physical restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, that liberty interest is not absolute," and "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty") . . . ; <u>Foucha v. Louisiana</u>, 504 U.S. 71, 117 (Thomas, J., dissenting) (noting that "a liberty interest per se is not the same thing as a fundamental right," and that the Supreme Court "has never applied strict scrutiny to the substance of state laws involving involuntary confinement of the mentally ill"); <u>but see</u> <u>Karsjens</u>, 109 F. Supp. 3d at 1166, 2015 WL 3755870, at *26 (concluding that strict scrutiny applied to the plaintiffs' claims regarding the constitutionality of Minnesota's [Sexually Violent Predator] civil commitment statute because the plaintiffs' "fundamental right to live free of physical restraint is constrained by the curtailment of their liberty."); [<u>In re Care & Treatment of</u> ]<u>Coffman</u>, 225 S.W.3d [839,] 445 [(E.D. Mo. Dec. 22, 2015)] (concluding that Missouri's SVP Act is "subject to strict scrutiny because it affects the fundamental right of liberty.").
>
> Although it has not applied strict scrutiny to civil commitment statutes, the Supreme Court has held that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." <u>Jackson v. Indiana</u>, 406 U.S. 715, 738 (1972); <u>Foucha</u>, 504 U.S. at 79 (same). That purpose must not be punitive, as punishment is reserved for the criminal system. <u>Bell v. Wolfish</u>, 41 U.S. 520, 535 (1979); <u>Hendricks</u>, 521 U.S. at 373 (Kennedy, J., concurring). ("[W]hile incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone."). And a failure to consider or use "alternative and less harsh" restrictions may indicate an unconstitutional purpose to punish. <u>Bell</u>, 441 U.S. at 539 n.20. Moreover, 'even if [a person's] involuntary confinement was initially permissible, it could not constitutionally continue after th[e] basis [for it] no longer existed.' <u>O'Connor v. Donaldson</u>, 422 U.S. 563, 575 (1975).
>
> As construed by the Missouri Supreme Court, the purpose for which individuals are involuntarily committed under the SVP Act is to "protect[]

society from persons who are likely to commit sexually violent crimes if not committed." <u>Coffman</u>, 225 S.W.3d at 445. The United States Supreme Court has recognized that, ordinarily, "[w]e must . . . accept the state court's view of the purpose of its own law." <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779, 829 (1995).

129 F. Supp. 3d at 863-64 (internal parallel citations omitted). The <u>Willis</u> court also discussed, but declined to follow, <u>Karsjens</u>' application of a strict scrutiny standard. 2016 WL 1267766, at *20-22.

A critical fact in <u>Karsjens</u>' use of the strict scrutiny standard was that Minnesota had never released anyone from its sex offender treatment program in the more than twenty years since the program's inception, thus leading to that court's conclusion that the program was punitive in nature. Missouri had conditionally released at least a few individuals from its sex offender program. But, at least 46 persons have been released from SOTEP. Like the Missouri courts, the North Dakota courts have interpreted the purposes of chapter 25-03.3 as protecting the public, especially children, and providing treatment. <u>In re P.F.</u>, 744 N.W.2d 724, 732 (N.D. 2008). Given that North Dakota has discharged a significant number of SDIs, this case is distinguished from <u>Karsjens</u>. Because of that difference, this court recommends application of the rational basis standard stated in <u>Hendricks</u> and <u>Van Orden</u>—whether the nature and duration of commitment bears some reasonable relation to the purpose for which the individual is committed.

## 3. Substantive Due Process

The right to substantive due process provides protection from arbitrary governmental action. Substantive due process limits civil commitments to those who are both mentally ill and pose a substantial danger to the public as a result of their illness.

Foucha v. Louisiana, 504 U.S. 71, 77 (1992). Once either of those criteria—mental illness or dangerousness—is no longer met, continued confinement is not constitutionally permissible. Id. at 77-78. Due process also requires that "the nature of commitment bear some reasonable relation to the purpose for which the individual is committed, " and there must be constitutionally adequate procedures to establish the basis of the confinement. Id. at 79.

In Foucha, the Supreme Court held unconstitutional a Louisiana law "which permitt[ed] the indefinite detention of insanity acquittees who [were] not mentally ill but who [did] not prove they would not be dangerous to others." Id. at 83. Louisiana claimed that "it may continue to confine Foucha, who [was not] considered to be mentally ill, solely because he [was] deemed dangerous, but without assuming the burden of proving [that] ground for confinement by clear and convincing evidence." Id. at 86. The court found "at least three difficulties with this position." Id. at 78. "First, even if his continued confinement were constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." Id. "Second, if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement." Id. at 79. Lastly, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" Id. at 80 (quoting Zinermon v. Burch, 494 U.S. 113, 125 (1990)).

**4.    Defendants' Motion for Partial Summary Judgment—Eighth Amendment Challenge by Proposed Juvenile Subclass**

The defendants move for summary judgment on all of the plaintiffs' Eighth Amendment claims. The plaintiffs oppose that motion only insofar as it concerns those whose only sexually predatory conducted occurred while they were juveniles. The plaintiffs contend that, if chapter 25-03.3 is found to be punitive on its face, the court should hold that commitment of persons whose only sexually predatory conduct occurred while they were juveniles constitutes cruel and unusual punishment in violation of the Eighth Amendment. (Doc. #367, pp. 31, 33). But, if the court does not conclude that the chapter is punitive on its face, the plaintiffs argue that it should be found unconstitutional in its application to those whose only sexually predatory conduct occurred while they were juveniles.

The plaintiffs point to a series of recent Supreme Court cases in which the Court has treated juveniles differently from adults. Miller v. Alabama, 132 S. Ct. 2455, 2464 (2012), held it was unconstitutional to impose mandatory life imprisonment without parole for crimes committed as a juvenile. Graham v. Florida, 560 U.S. 48, 74 (2010), declared imprisonment for life without parole for non-homicide crimes committed as a juvenile unconstitutional. Roper v. Simmons, 543 U.S. 551, 568 (2005), found it unconstitutional to impose the death penalty on those who committed offenses as juveniles. Each of the three decisions was based on the punishment being cruel and unusual in violation of the Eighth Amendment when imposed on juveniles.

The record is insufficient to decide whether, as applied to those whose only sexually predatory conduct occurred while they were juveniles, chapter 25-03.3 imposes

unconstitutional cruel and unusual punishment to those in the proposed Juvenile

Subclass. The defendants' motion, to the extent is seeks a dismissal of the as-applied

Eighth Amendment claims involving those whose only sexually predatory conduct

occurred while they were minors, should be denied.

5.      **Defendants' Motion for Partial Summary Judgment—Equal Protection Challenge**

The plaintiffs contend that, for purposes of equal protection analysis, SDIs are

similarly situated to persons civilly committed under North Dakota Century Code

chapter 25-03.1, which governs commitment of PRTs because of serious mental

disorders or chemical dependency. They point to In re M.D., 598 N.W.2d 799 (N.D.

1999), in which a person found to be an SDI challenged the constitutionality of chapter

25-03.3 on double jeopardy grounds. The North Dakota Supreme Court affirmed the

order for SDI commitment, finding that chapter 25-03.3 created a process which is civil

in nature and which therefore does not violate the double jeopardy clause. In reaching

that conclusion, the court considered that chapter 25-03.1 and chapter 25-

03.3—governing PRT commitment and SDI commitment, respectively—are "close in

proximity and content," thus demonstrating the legislature's intent to create a civil

proceeding for SDIs as it did for PRTs. Id. at 805-06. In addition to relying on In re

M.D., the plaintiffs assert that SDIs are similarly situated to PRTs because both can be

committed without proof beyond a reasonable doubt of commission of criminal conduct.

(Doc. #367, p. 26).

In the plaintiffs' view, chapter 25-03.3 allows a person to be committed as an SDI

based on a lesser probability of future dangerous conduct than is required for

commitment as a PRT, and based on a probability of less dangerous conduct. (Doc. #367, pp. 25-26). A person can be committed as a PRT only if "there is a <u>reasonable expectation</u> that if the individual is not treated for the mental illness or chemical dependency there exists a serious risk of harm to that individual, to others, or to property." N.D. Cent. Code § 25-03.1-02(13) (emphasis added). Commitment as an SDI requires proof that the person is "<u>likely</u> to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others." <u>Id.</u> § 25-03.3-01(18) (emphasis added). In other words, the plaintiffs view "likelihood" as a lesser standard than "reasonable expectation."

The plaintiffs identify various procedural protections statutorily provided to PRTs but not to SDIs: (1) SDIs are placed in county jails pending probable cause hearings, while PRTs cannot be held in county jails absent actual emergency and lack of other secure facilities; (2) if a court finds probable cause that a person is an SDI, the person is transferred to NDSH for evaluation, while if a court finds probable cause that a person is a PRT, the person can be confined for evaluation only at a treatment facility, and only for up to fourteen days; (3) hearsay evidence and evidence of prior bad acts is excluded from PRT hearings, but explicitly allowed in SDI hearings; (4) SDIs are committed indefinitely, while PRTs can be committed for no more than 90 days without further court involvement; and (5) an SDI who commits a simple assault against an NDSH employee is subject to Class C felony charges, while a PRT who commits the same offense against an NDSH employee is subject to only a misdemeanor charge. (Doc. #367, p. 30).

The defendants contend that SDIs and PRTs are not similarly situated, because of the differing purposes and standards for their civil commitment, and the length of treatment required. Though not questioning the commonality in applicable standards of proof, the defendants argue that single commonality is not sufficient to negate other differences between the two groups. (Doc. #383, p. 6). They argue that both the nature of potential harm and the probability of potential harm are constitutionally significant distinctions. The defendants view the <u>likelihood</u> of future sexually predatory conduct required for SDI commitment as greater than the <u>reasonable expectation</u> of future harm required for PRT commitment. (Put differently, the plaintiffs and defendants have contrary views on which is greater—a likelihood or a reasonable expectation.) As to the nature of potential future harm, the defendants argue that SDI commitment addresses potential future harm only to other persons—and especially to children—whereas PRT commitment addresses potential future harm to property, to the individual being considered for commitment, and to other persons.

The defendants cite a number of cases in which courts in other states, and other federal courts, have rejected equal protection challenges to some aspects of sex offender commitment statutes. (Doc. #249, pp. 27-29). The plaintiffs counter that each of those cases is distinguishable because they involved persons who had been convicted of or found by proof beyond a reasonable doubt to have committed sexually violent acts. (Doc. #367, pp. 26-29). A careful reading of those cases shows that a prior conviction or previous finding by proof beyond a reasonable doubt is among the factors considered, but not the sole determining factor in any of these cases. The court also notes that those cases appear to have used a rational basis standard, rather than the strict scrutiny

standard plaintiffs argue here. And, as discussed below, <u>see</u> <u>infra</u> Section 10, pp. 37-40, there is no allegation that any named plaintiff was not found to have committed sexually predatory conduct beyond a reasonable doubt.

Though acknowledging that no other court has reached the conclusion they urge on their equal protection claim,[7] the plaintiffs cite two cases for their proposition that North Dakota's statutory distinctions between SDIs and PRTs are arbitrary and lack a rational basis. (Doc. #367, p. 29). Neither case, however, directly addresses the questions presented here. In the first case, <u>Jackson v. Indiana</u>, 406 U.S. 715, 729 (1972), the Supreme Court found an equal protection violation where persons subject to a commitment proceeding while criminal charges were pending were treated differently from those subject to commitment proceedings when no criminal charges were pending. The plaintiffs also cite a habeas case, in which the Supreme Court concluded a sex offender was entitled to a hearing on his claim that he was denied equal protection because he was not afforded a jury determination in a commitment proceeding, when other persons subject to commitment proceedings were allowed jury determinations; that opinion reached no decision on the petitioner's underlying equal protection claim, but held only that he was entitled to a hearing on that claim. <u>Humphrey v. Cady</u>, 405 U.S. 504 (1972).

In this court's opinion, SDIs and PRTs are not similarly situated for purposes of equal protection analysis. As other courts have recognized in deciding similar challenges, there are significant differences between the two groups with respect to the

---

[7] Neither <u>Karsjens</u>, <u>Van Orden</u>, nor <u>Willis</u> included equal protection claims similar to that raised in this case.

nature of risk, the type and length of treatment required, and the criteria required for commitment of the two groups. But for those differences between the two groups, the legislature would have had no reason to enact chapter 25-03.3.

If, however, SDIs <u>were</u> found to be similarly situated to PRTs, the court must determine the standard of review to be employed. If a fundamental right is found, the court must then consider whether, under a strict scrutiny standard, the statutes are narrowly tailored to serve a compelling governmental interest. If no fundamental right is found, the court conducts a rational basis review rather than applying strict scrutiny. <u>Aune v. Ludeman</u>, No. 09-0015, 2010 WL 145276, at *9-10 (D. Minn. Jan. 8, 2010). As discussed above, this court recommends review on a rational basis standard.

The plaintiffs do not contend that chapter 25-03.3 violates equal protection under a rational basis standard. In this court's opinion, even if SDIs and PRTs were found to be similarly situated for purposes of equal protection analysis, the plaintiffs' equal protection claim would fail under a rational basis analysis. The defendants' motion for summary judgment on the equal protection claim should therefore be granted.

## 6. Defendants' Motion for Summary Judgment on Facial Unconstitutionality of Indefinite Commitment

The defendants argue that indefinite commitment of SDIs is constitutional under <u>Hendricks</u> and seek summary judgment dismissing the plaintiffs' claim that chapter 25-03.3 is facially unconstitutional because it allows indefinite commitment. Under the Kansas scheme upheld in <u>Hendricks</u>, a sex offender could be involuntarily committed for a maximum of one year "pursuant to a single judicial proceeding." 521 U.S. at 364.

The defendants argue that North Dakota provides a sufficiently similar limitation on duration of confinement, through the statutory requirement for an annual examination, with a report of that examination provided to the committing court, and the annual notice of the right to petition for a discharge hearing. (Doc. #249, p. 30).

The plaintiffs' briefing does not argue that indefinite commitment by itself is unconstitutional; rather the plaintiffs contend indefinite commitment <u>together with</u> the absence of an affirmative duty to petition for release when a person no longer meets SDI criteria violates substantive due process. Given the plaintiffs' position in that regard, the defendants should be granted summary judgment insofar as the Sixth Amended Complaint alleges that chapter 25-03.3 violates substantive due process on its face solely by allowing for indefinite commitment.

**7.     Motion to Strike Exhibit A**

Since it relates to the plaintiffs' cross-motion concerning the duty to initiate discharge proceedings, the court next addresses the plaintiffs' "motion to strike." Along with their responsive brief, the defendants filed an affidavit of NDSH Superintendent Dr. Rosalie Etherington, describing the process NDSH follows in conducting annual evaluations of SDIs. (Doc. #383-1). The plaintiffs move to strike Exhibit A to that affidavit—a spreadsheet summarizing information about each individual who has ever been evaluated by or committed to SOTEP—contending it references evidence which has not been provided during discovery.

The gravamen of this dispute centers on confidential records of nonparties who have not signed authorizations to release their records to plaintiffs' counsel. Plaintiffs made broad discovery requests, seeking virtually all records of each person who has

been evaluated by and/or committed to SOTEP, and the court has considered several discovery disputes involving this issue. The court has consistently limited required production to records of named plaintiffs and those who have signed authorizations for release of information, and the court has directed redaction of confidential information about nonparties who have not signed releases. (Doc. #287, p. 7; Doc. #324, pp. 3-4; Doc. #352, pp. 23-24). In Exhibit A, which they produced in discovery prior to filing it with the court, the defendants included information compiled from records which have not been ordered to be provided to the plaintiffs. Thus, the plaintiffs have no means to verify accuracy of the compilation, and move to strike Exhibit A for that reason.[8]

Federal Rule of Civil Procedure 12(f) allows motions to strike pleadings, but the document at issue is not a pleading within the meaning of Rule 7(a). "Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly." 2 James W. Moore et al., Moore's Federal Practice § 12.37[2] (3d ed. 2012). See also Shea v. Peoples Nat'l Bank, No. 4:11-CV-1415, 2013 WL 74374, at *1 (E.D. Mo. Jan. 7, 2013); Carlson Mktg. Group, Inc. v. Royal Indem. Co., No. 04-CV-3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006). Since Exhibit A is not a pleading, Rule 12(f) does not apply. This court instead considers plaintiffs' motion to strike as a request to exclude the exhibit as evidence for purposes of these motions.

---

[8] The defendants state that disclosure of the records "remains unnecessary," but ask that if the court finds otherwise, an order be issued "to assure disclosure of such confidential records was authorized." (Doc. #383, p. 27 n.12).

Rule 56(c)(4) requires that an affidavit used to support a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Since the plaintiffs have not had access to all of the records which the defendants used in preparing Exhibit A, it is not clear that Exhibit A would be admissible in evidence. See Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1111 (8th Cir. 2005); Maytag Corp. v. Electrolux Home Prods., Inc., 448 F. Supp. 2d 1034, 1062 (N.D. Iowa 2006). This court has therefore not considered Exhibit A to the Etherington affidavit, and recommends that the district judge likewise not consider it.

The plaintiffs objected only to Exhibit A, and not to the Etherington affidavit itself. In fact, the plaintiffs contend that the affidavit itself supports their position. (Doc. #393, p. 9). In her affidavit, Etherington describes the NDSH process for preparing annual examination reports and submitting those reports to the court which ordered commitment of an SDI. (Doc. #383-1). She describes NDSH not preparing petitions when filing annual reports with committing courts, but treating the annual reports "as requesting the receiving court to adopt the recommendation made." Id. at 4. Etherington states that, "even though not labeled a 'petition,' providing the annual report to the court has the same effect and is treated by NDSH the same way as a means to communicate its request that the court issue an order consistent with what was recommended." Id.

## 8. Plaintiffs' Motion—Absence of Affirmative Duty to Petition for Discharge

The plaintiffs' cross-motion argues that chapter 25-03.3 violates due process on its face, because it allows for indefinite commitment without requiring the defendants to

take any affirmative action when a civilly committed person no longer meets the statutory definition of an SDI. The plaintiffs contend that the North Dakota statute is akin to that invalidated in <u>Karsjens</u>, in that it <u>permits</u>, but does not <u>require</u>, the custodial agency to petition for discharge if a person no longer satisfies SDI criteria. (Doc. #367, p. 12). The plaintiffs assert that, though due process mandates release of persons who no longer meet SDI criteria, chapter 25-03.3 makes defendants' initiation of that release discretionary. <u>Id.</u> at 14. The plaintiffs contend that chapter 25-03.3's lack of that affirmative duty violates substantive due process, on its face, regardless of the standard of scrutiny applied.

In support of their motion for class certification, the plaintiffs identified four cases where DHS did not oppose an SDI's discharge petition, arguing that the absence of opposition to discharge indicated the person no longer met SDI criteria, and that DHS should have initiated discharge in those circumstances rather than leaving initiation of discharge to the SDI. (Doc. #343-1, pp. 6-7; Doc. #367, p. 15). They argue that, in the absence of an affirmative duty, "there may be a significant time lapse between the time when a person no longer meets the criteria for civil commitment and the time that he is able to have his petition for discharge heard by the court or the information is made available to the court," resulting in a person being confined after the state no longer has a legitimate interest in that confinement. (Doc. #367, p. 16). The plaintiffs also point to statutory provisions regarding community placement—that DHS has no affirmative duty to petition for community placement or to conduct risk assessments to determine whether community placement is appropriate for an SDI. <u>Id.</u> Additionally, the plaintiffs point to the statutory requirement for annual examinations not being accompanied by a

requirement for any court hearing after the committing court receives the annual examination report, or by any requirement for a periodic order for continued commitment.

Further, the plaintiffs argue that chapter 25-03.3 sets a higher standard for discharge than for initial commitment. Section 25-03.3-17(1) provides that a committed person is to remain in DHS custody "until, in the opinion of the executive director, the individual is safe to be at large," whereas initial commitment requires that a person be found "likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others," N.D. Cent. Code § 25-03.3-01(8). The plaintiffs argue that chapter 25-03.3 is like the law found unconstitutional in Karsjens, which based initial commitment on a "highly likely to reoffend" standard, but based discharge on a "no longer dangerous to the public" standard. 109 F. Supp. 3d at 1169.

The defendants respond that the "'safe to be at large' language is wholly consistent with the criteria for a 'sexually dangerous individual.'" (Doc. #383, p. 30). They point to In re G.R.H., 793 N.W.2d 460, 466 (N.D. 2011), where the North Dakota Supreme Court interpreted "likely to engage in further acts of sexually predatory conduct" to mean "the individual's propensity toward sexual violence is of such a degree as to pose a threat to others." The defendants argue that if a propensity toward sexual violence poses a threat to others, it logically follows that the person is not safe to be at large. (Doc. #383, p. 30). Regardless of the "safe to be at large" language, in reviewing a petition for discharge, the state court applies the same statutory criteria used to decide an initial commitment petition. In this court's opinion, therefore, chapter 25-03.3 does not set a higher standard for discharge than for initial commitment.

There is no question that a civilly committed individual "may be held as long as he is both mentally ill and dangerous, <u>but no longer</u>." <u>Foucha</u>, 504 U.S. at 77 (emphasis added). The state "has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others." <u>Addington v. Texas</u>, 441 U.S. 418, 426 (1979).

The defendants' primary argument on this claim is that chapter 25-03.3's annual examination process defeats the plaintiffs' facial challenge, because the "clear import of [the statutory annual examination process] is to establish a continual evaluation of each committee to determine whether the person does or does not meet the criteria of an SDI and in turn to determine whether or not continued commitment and treatment is warranted." (Doc. #383, p. 25). The plaintiffs respond that the defendants' position is an admission that they interpret their "duty to petition for release or community placement of SDIs who no longer meet the criteria for civil commitment [to] arise[] only in connection with [] annual review." (Doc. #393, p. 10).

The defendants contend that no case law supports the claim that chapter 25-03.3's lack of an affirmative duty to petition for discharge makes the statute facially unconstitutional. (Doc. #383, p. 19). The plaintiffs acknowledge the absence of supporting case law, but attribute that to North Dakota's system being "an outlier in that regard." (Doc. #393, p. 4). The plaintiffs cite statutes of thirteen other states that mandate governmental action if a civilly committed sex offender no longer meets criteria for civil commitment. (Doc. #393, p. 4 n.1).

The defendants contend that chapter 25-03.3's differences from Minnesota's civil commitment statutes are significant, so that the <u>Karsjens</u> decision is distinguishable.

Karsjens, applying a strict scrutiny standard, found Minnesota's absence of a requirement for periodic risk assessments of civilly committed sex offenders to violate substantive due process, both on its face and as applied. 109 F. Supp. 3d at 1172-73. The defendants identify six ways in which chapter 25-03.3 differs from the Minnesota statutes found deficient in Karsjens: (1) chapter 25-03.3 requires annual examinations; (2) all proceedings under chapter 25-03.3 are "premised upon a judicial process [of] court involvement"; (3) chapter 25-03.3's criteria for discharge are the same as those for initial commitment—clear and convincing evidence that the person is an SDI; (4) under chapter 25-03.3, the burden of proof—clear and convincing evidence that the person remains an SDI—remains with the state at discharge hearings; (5) chapter 25-03.3 mandates commitment to the least restrictive available treatment facility; and (6) chapter 25-03.3 requires that reports of annual examinations be filed with the court. (Doc. #383, pp. 22-23).

The defendants also contend Van Orden rejected the plaintiffs' facial challenge, even though Missouri statutes did not specifically require the state to initiate discharge of a sex offender who no longer met statutory criteria. (Doc. #383, p. 21). But Van Orden is unavailing to defendants' position, because that case did not address a challenge based on absence of an affirmative duty to petition for discharge. The defendants also contend that chapter 25-03.3 is like the Kansas statute upheld in Hendricks, in that the Kansas statute provided for annual examinations to be forwarded to the committing court. But, as the plaintiffs identify, the Kansas statute at issue in Hendricks also required that a court conduct an annual review hearing. In addition to the required annual report, the statute considered in Hendricks required the custodial agency to

authorize a petition for transitional release if the person was no longer likely to engage in acts of sexual violence. Relying on <u>Hendricks</u> and <u>Van Orden</u>, the defendants argue that:

> the only reasoned conclusion . . . is the statutes are construed to make sense—that when, as a result of a statutory examination process, it is found the committed person no longer meets the criteria for commitment, the construction of the statute is that the process of discharge ensues, even though the statutes do not have specific language mandating the filing of a petition for discharge by the state agency.

(Doc. #383, p. 21). In other words, the defendants contend that chapter 25-03.3 should be interpreted to include an affirmative duty to initiate release, even though that duty is not explicit in the language of the statute.

The defendants argue that the plaintiffs' arguments conflict with basic rules of statutory construction and interpretation. Principles of statutory construction defendants cite include: (1) that the objective be to determine the legislature's intent; (2) that words be given their plain, ordinary, and commonly understood meaning; (3) that statutes be construed as a whole and harmonized to give meaning to related provisions; (4) that statutory language be interpreted in context and according to rules of grammar, giving meaning and effect to every word, phrase, and sentence; (5) that statutes be construed to give effect to all provisions, so that no part is rendered inoperative or superfluous; (6) that statutes be construed to avoid absurd or illogical results; and (7) that statutes be construed so as to avoid constitutional infirmities. (Doc. #383, pp. 24-25) (citing <u>Sandberg v. Am. Family Ins. Co.</u>, 722 N.W.2d 359 (2006); <u>Teigen v. State</u>, 749 N.W.2d 505 (N.D. 2008)). The defendants argue that application of those principles of statutory construction leads to the conclusion that chapter 25-03.3 establishes a

mandatory "continual evaluation" to determine whether an individual continues to meet SDI criteria. They argue that construction is consistent with chapter 25-03.3's stated purpose of protecting the public while at the same time treating SDIs so that they may safely return to the community. Id. at 25. The defendants characterize the Etherington affidavit as demonstrating that they have applied and utilized the annual examination process in a manner that comports with due process—"to evaluate, assess, and make recommendations to the court as to whether the person does or does not meet the criteria as a 'sexually dangerous individual.'" Id. at 26.

According to the defendants, "the construction of the word 'may' [in North Dakota Century Code section 25-03.3-17(5)] must be mandatory when NDSH has found the person no longer is a sexually dangerous individual or NDSH has concluded successful treatment of the person can be achieved by a change in commitment status." Id. at 31. But, the defendants identify no North Dakota court having interpreted the word "may" in section 25-03.3-17(5) as establishing a mandatory duty to petition for discharge.[9] Rather, they rely on rulings involving other aspects of chapter 25-03.3. The defendants argue that, "even though specific language may not necessarily be found within the statutes, the North Dakota Supreme Court concluded the due process principles, as outlined by the United States Supreme Court, are incorporated into N.D.C.C. Chapter 25-03.3" Id. at 18. Defendants cite case law where, interpreting chapter 25-03.3 to require a nexus between a mental disorder and future

---

[9] The court also notes that chapter 25-03.1, dealing with civil commitment of PRTs, provides that if a person is no longer a PRT, the superintendent or director "shall discharge" the person. No court order is required; only notice to the court is required.

dangerousness, the North Dakota Supreme Court stated that it reached that holding "[c]onsistent with the language in [the] statute and to avoid any possible constitutional infirmity." In re G.R.H., 711 N.W.2d at 594-95; In re M.D., 757 N.W.2d at 561.

As recognized in Van Orden, in considering a facial challenge to a state statute, a federal court must consider "any limiting construction that a state court . . . has proffered." 129 F.Supp 3d at 865. But, the VanOrden court referred to an explicit holding of the Missouri Supreme Court—that a civilly committed sex offender must be released if he is "no longer dangerous, regardless of whether the reason he is no longer dangerous is primarily mental or physical." Id. In so holding, the Missouri Supreme Court rejected the state's argument that release was limited to those whose mental abnormality had changed, regardless of whether they continued to be dangerous.

The North Dakota courts, however, have not specifically construed chapter 25-03.3 to include an affirmative duty to initiate discharge of those who no longer meet SDI criteria. The defendants ask this court to consider the statutory interpretation they advance in their motion as if it were authoritative state case law. But, it is not authoritative case law; rather, it is the defendants' assertion that they apply chapter 25-03.3 so as to satisfy substantive due process. The plaintiffs vigorously contest that assertion.

The defendants argue the statutory construction which the plaintiffs urge would make the statutory annual examination process useless. (Doc. #383, pp. 27-28). This court disagrees. The plaintiffs do not challenge the annual examination process itself; rather, they challenge chapter 25-03.3 not requiring action between annual exams if an SDI no longer meets statutory criteria.

In this motion, the court is not asked to decide whether the defendants <u>apply</u> chapter 25-03.3 in a manner that avoids constitutional infirmities. If, in fact, the defendants are doing "continual evaluations" to determine whether individuals still meet SDI criteria, and timely initiating release of those individuals who do not meet those criteria, the plaintiffs' as-applied challenge may well fail. But, this motion is a challenge to facial validity, and the court's task is to determine whether the plaintiffs have established that, because of the absence of an affirmative duty to initiate release for an SDI who no longer meets statutory criteria, no set of circumstances exists under which chapter 25-03.3 is constitutional. To make that determination, <u>Patel</u> mandates focusing on "the group for whom the law is a restriction, not the group for whom the law is irrelevant." 135 S.Ct. at 2451 (quoting <u>Casey</u>, 505 U.S. at 894).

<u>Patel</u> was a challenge to a city ordinance which required hotel operators to keep records of certain information about guests, and to make those records available to law enforcement without a search warrant. <u>Id.</u> at 2448. The court held the ordinance was facially invalid, because it did not provide for precompliance review. <u>Id.</u> at 2451. Hypothetical situations that were not unconstitutional—e.g., exigent circumstances or consent of the hotel operator—were considered irrelevant in determining facial constitutionality, since they did not involve actual application of the ordinance. <u>Id.</u> The plaintiffs contend:

> That there may be cases in which the executive director petitions for release of an SDI who no longer satisfies the commitment criteria does not prevent plaintiffs from satisfying the "no set of circumstances" standard. Those hypothetical petitions are not relevant in the analysis because they do not result from application of the statute—since Chapter 25-03.3 never *requires* the executive director to petition for release, any petition filed is filed despite

the terms of the statute. Thus, like in <u>Patel</u>, the statute's failure to provide the constitutionally required protections renders it facially invalid.

(Doc. #393, p. 12).

<u>Patel</u> directs that the focus be on "the group for whom the law is a restriction, not the group for whom the law is irrelevant." Thus, the focus of this court's inquiry is on SDIs who no longer meet criteria as to whom DHS <u>has not</u> initiated release, rather than on SDIs who no longer meet criteria as to whom DHS <u>has</u> initiated release. If an SDI no longer meets criteria, due process requires that he be discharged. But, if he has had a discharge hearing within the preceding twelve months, chapter 25-03.3 does not allow him to petition the court for discharge until the twelve month period ends. Thus, he could be discharged only if DHS initiates the process with the state court. Whether DHS does that through filing an annual examination report or through filing a document labeled a "petition," is not the critical question. The critical question is when that filing is made with the state court. On its face, chapter 25-03.3 does not require that DHS file anything with the court between annual examination reports. Thus, on its face chapter 25-03.3 allows a person to continue to be confined as an SDI, for up to one year, even though he no longer meets statutory criteria. In this court's opinion, chapter 25-03.3, on its face, violates substantive due process rights in that respect, because it is not reasonably related to the purposes of chapter 25-03.3. The plaintiffs' cross-motion for partial summary judgment on that issue should be granted.

**9.    Defendants' Motion—Judicial Release Process**

One of the defendants' requests for partial summary judgment is stated very generally and addressed in only one paragraph of their brief:

> Other concerns the Minnesota court raised with the facial constitutionality of Minnesota's statute do not apply to N.D.C.C. ch. 25-03.3. For example, as previously explained, N.D.C.C. 25-03.3 has a judicial release process which includes a right to legal counsel, a right to a medical expert, and places the burden of proof on the State. Moreover, N.D.C.C. ch. 25-03.3 requires the State to take affirmative action annually. The State is required to examine the committed individual annually and provide the examination report to the court that ordered the civil commitment and to give the committed individual annual notice of the right to petition for discharge from the commitment.

(Doc. #249, pp. 32-33) (citations omitted). The plaintiffs have not addressed this aspect of the defense motion directly, but, as discussed above, have addressed chapter 25-03.3's annual examination requirement extensively.

This section of the defendants' motion could be interpreted to seek summary judgment on <u>all</u> of the plaintiffs' claims of facial unconstitutionality; or, it could be interpreted to seek summary judgment <u>only</u> on any claim that chapter 25-03.3's annual examination requirement does not meet substantive due process standards. If the first interpretation was intended, the parties' briefing is not adequate to allow the court to decide the issue; if the second interpretation was intended, the issue is addressed above in the context of the plaintiffs' cross-motion. To the extent the defendants' motion as stated in Document #249, Section VI(C), pp. 32-33, seeks summary judgment on any matter other than the plaintiffs' claim that chapter 25-03.3's annual examination requirement does not meet substantive due process standards because it does not include an affirmative duty to seek discharge of those who no longer meet statutory criteria, that motion should be denied.

## 10.    Cross-Motions—No Requirement for Criminal Conviction and SDI Commitment Based on Clear and Convincing Evidence

The defendants move for summary judgment on plaintiffs' claim that chapter 25-03.3 violates due process in that it does not require that an individual have been

criminally convicted of a sex offense to be committed as an SDI. They assert that North Dakota's statutory requirements for findings of both future dangerousness and a related mental disorder satisfy substantive due process requirements of <u>Hendricks</u>.[10] The defendants also move for summary judgment on the plaintiffs' claim that chapter 25-03.3 is unconstitutional because it allows SDI commitment based on a finding of sexually predatory conduct by clear and convincing evidence rather than requiring proof beyond a reasonable doubt.

The plaintiffs' briefing does not assert that either of those provisions—not requiring a criminal conviction, or allowing commitment based on clear and convincing evidence—is, by itself facially violative of substantive due process. In light of the plaintiffs' position, the defendants should be granted summary judgment insofar as the Sixth Amended Complaint alleges that chapter 25-03.3 violates substantive due process on its face solely by allowing for commitment without a criminal conviction, or solely by allowing for commitment based on clear and convincing evidence of sexually predatory conduct.

The plaintiffs, however, cross-move for a declaration that chapter 25-03.3, on its face, violates substantive due process rights, insofar as it allows an SDI commitment <u>both</u> without a prior criminal conviction and without requiring proof of sexually predatory conduct beyond a reasonable doubt. But, the Sixth Amended Complaint does not allege that any named plaintiff was civilly committed in the absence of either a prior

---

[10] Since the plaintiffs now acknowledge that, unless North Dakota's SDI system is found to be punitive in nature, the Eighth Amendment does not apply, this opinion does not address the defendants' arguments that the Eighth Amendment does not prohibit commitment without a prior criminal conviction. (Doc. #249, pp. 11-16).

criminal conviction or a prior juvenile adjudication. The court notes that cases from other states addressing similar issues primarily concern persons found incompetent to stand trial or not guilty because of insanity, and the Sixth Amended Complaint does not allege any named plaintiff was subject to a similar finding. Both an adult criminal conviction and a juvenile adjudication require proof beyond a reasonable doubt. Thus, there is no allegation that any named plaintiff was civilly committed in the absence of proof of sexually predatory conduct beyond a reasonable doubt.

Though not raised by the defendants in these motions, it appears to the court that standing is lacking as to these claims. "[A] plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006). The recent Report and Recommendation concerning class certification described standing requirements:

> In . . . any . . . federal case, plaintiffs must establish standing to sue. The purpose of the standing requirement is to ensure that a plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204 (1962). Federal courts use a well-known three-part test to determine whether a plaintiff has standing to sue. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered "injury in fact." Second, the injury must be traceable to the defendant's action which is being challenged. Id. Finally, the injury must be one that would be redressed by a decision favorable to the plaintiff. Id. at 561. The first element—injury in fact—requires a showing that an injury is concrete and particularized and "actual or imminent," not conjectural or hypothetical. Id. at 560.

(Doc. #394, pp. 12-13).

It appears to this court that none of the named plaintiffs meet any of the three requirements as to the claims concerning absence of a requirement for a criminal conviction or absence of a requirement for a finding of past sexually predatory conduct

beyond a reasonable doubt. Since each plaintiff has been either criminally convicted or juvenilely adjudicated delinquent of sexually predatory conduct, none has suffered injury because chapter 25-03.3 does not require a prior criminal conviction or previous sexually predatory conduct proved beyond a reasonable doubt. Even if any of them had suffered injury because of those provisions of chapter 25-03.3, that injury would not be fairly traceable to any actions of any of these defendants. Nor would any named plaintiff be able to demonstrate that he would be subject to the same standards again in the future. It is well recognized that a plaintiff who has suffered an actual injury but is unlikely to suffer further injury in the future may have standing to bring a claim for damages but not to seek equitable relief. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)); Elizabeth M. v. Montenez, 458 F.3d 779, 784 (8th Cir. 2006).

Because no named plaintiff has the requisite standing, this court recommends that the plaintiffs' cross-motion for summary judgment on these claims be denied.

## Conclusion

The court recommends that the plaintiffs' motion to strike be considered as a motion to exclude evidence for purposes of these motions, and that the document which is the subject of that motion not be considered in connection with the pending motions.

This court recommends that partial summary judgment be granted in favor of all defendants as to:

(1)     all claims based on allegations that Rodney J. Ireland, Matthew Graham, Christopher Simon, John Westlie, Michael Kruk, and Robert Lilley were minors during their SDI commitment proceedings;

(2)     plaintiffs' equal protection claim based on plaintiffs being similarly situated to persons incarcerated because of criminal convictions;

(3)     plaintiffs' equal protection claim based on plaintiffs being similarly situated to persons requiring treatment under chapter 25-03.1;

(4)     plaintiffs' claim that chapter 25-03.3 is unconstitutional on its face because it does not include a right to a jury trial in SDI commitment proceedings; and

(5)     allegations of the Sixth Amended Complaint that chapter 25-03.3's (1) allowing for indefinite commitment; (2) allowing for commitment without a criminal conviction; or (3) allowing for commitment based on clear and convincing evidence violates substantive due process on its face.

This court recommends that the plaintiffs' cross-motion for partial summary judgment be denied insofar as it concerns a claim that chapter 25-03.3 is facially unconstitutional because it allows SDI commitment <u>both</u> without a prior criminal conviction and without requiring proof beyond a reasonable doubt of sexually predatory conduct.

Further, this court recommends that the plaintiffs' cross-motion for partial summary judgment be granted insofar as it concerns a claim that chapter 25-03.3 is unconstitutional on its face because it does not <u>require</u> that the defendants initiate court proceedings for release of individuals who no longer meet SDI criteria.

Finally, this court recommends that the defendants' motion for partial summary judgment be denied:

(1)     as to Larry Rubey's claims;

(2)     as to plaintiffs' claim that application of chapter 25-03.3 to those whose only sexually predatory conduct occurred while they were juveniles constitutes unconstitutional cruel and unusual punishment; and

(3)     To the extent the motion as stated in Document #249, Section VI(C), pp. 32-33, seeks summary judgment on any matter other than the plaintiffs' claim that Chapter 25-03.3's annual examination requirement does not meet substantive due process standards.

Dated this 22nd day of September, 2016.

 /s/ *Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT

Pursuant to Rule 72(b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **October 7, 2016**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.